**UNITED STATES of America,**
**Plaintiff,**

v.

**INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION,**
**Defendant.**

**Civ. A. No. 13319.**

United States District Court,
D. Connecticut.

Dec. 31, 1970.

---

20

See also D.C., 306 F.Supp. 766.

Joseph H. Widmar, Howard B. Myers, Richard M. Clinton, Harold J. Bressler and Donald J. Frickel, Attys., Dept. of Justice, Washington, D. C., Stewart H. Jones, U. S. Atty., New Haven, Conn., for plaintiff.

Henry P. Sailer, Charles E. Buffon, Gerald P. Norton and Robert N. Sayler, of Covington & Burling, Washington, D. C., and Scott E. Bohon, New York City, for defendant.

ITT—GRINNELL MERGER
INDEX

|  | Page |
| --- | --- |
| QUESTION PRESENTED | 22 |
| JURISDICTION | 22 |
| PRIOR PROCEEDINGS | 22 |
| PARTIES TO THE ACTION | 23 |
| I. CLAIM THAT GRINNELL IS THE DOMINANT COMPETITOR IN CERTAIN LINES OF COMMERCE AND IN CERTAIN SECTIONS OF THE COUNTRY | 24 |
| (A) LINES OF COMMERCE | 24 |
| (1) Automatic Sprinkler Devices | 24 |
| (2) Automatic Sprinkler Systems | 24 |
| (3) Power Piping | 24 |
| (4) Pipe Hangers | 25 |
| (B) SECTIONS OF THE COUNTRY | 25 |
| (1) Entire United States: For All Lines of Commerce | 25 |

(2) Regional Areas: For Installation of Automatic Sprinkler Systems ... 25
(a) New England .............. 25
(b) State of Utah ............. 25
(c) Pacific Northwest (government's claim) .................. 25
(d) Inland Empire (government's claim) .................. 26
(C) DOMINANCE OF GRINNELL ......... 26
(1) Power Piping Market ........... 26
(2) Pipe Hangers Market ........... 27
(3) Automatic Sprinkler Devices Market 27
(4) Automatic Sprinkler Systems Market 27
SUMMARY UNDER THIS SECTION ...... 29
II. CLAIM THAT MERGER WILL CONFER MARKETING AND PROMOTIONAL COMPETITIVE ADVANTAGES UPON GRINNELL... 29
[REGARDING AUTOMATIC SPRINKLER DEVICES AND AUTOMATIC SPRINKLER SYSTEMS MARKETS]
(A) PACKAGE OR SYSTEM SELLING .... 30
(B) AFFILIATION WITH HARTFORD ...... 33
(C) ACCESS TO ITT'S FINANCIAL RESOURCES AND ADVERTISING ..... 37
(D) FOREIGN EXPANSION ............. 38
(E) VERTICAL FORECLOSURE .......... 39
(F) CENTRAL STATIONS .............. 40
(G) RECIPROCAL DEALING ............ 41
SUMMARY UNDER THIS SECTION ....... 47
III. CLAIM REGARDING POWER PIPING ..... 48
IV. CLAIM REGARDING PIPE HANGERS ..... 50
V. CREDIBILITY OF WITNESSES ..... ..... 51
VI. CLAIM OF ECONOMIC CONCENTRATION .. 51
CONCLUSIONS ........................... 55

## MEMORANDUM OF DECISION AFTER TRIAL ON THE MERITS

TIMBERS, Chief Judge:

### QUESTION PRESENTED

In this action brought by the United States (government), pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25 (1964), for declaratory and injunctive relief to enjoin the acquisition by International Telephone and Telegraph Corporation (ITT) of the stock of Grinnell Corporation (Grinnell) as an alleged violation of Section 7 of the Clayton Act, 15 U.S.C. § 18 (1964), the essential question for determination by the Court after trial on the merits is whether, upon the entire record, the government has sustained its burden of establishing that "in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition." [1]

For the reasons stated below, the Court holds that the government has not sustained its burden upon the essential issue set forth above. Defendant accordingly is entitled to judgment dismissing the complaint.

### JURISDICTION

The Court has jurisdiction over the subject matter and the parties pursuant to Section 15 of the Clayton Act, 15 U.S. C. § 25 (1964), and 28 U.S.C. § 1337 (1964).

Venue is properly laid in this District pursuant to 15 U.S.C. § 22 (1964); and in any event there has been no objection to venue. Rule 12(h)(1), Fed.R. Civ.P.

### PRIOR PROCEEDINGS

On October 21, 1969, after an evidentiary hearing, the Court filed a Memorandum of Decision [2] denying the government's motion for a preliminary injunction to enjoin the proposed acquisition of Grinnell by ITT, but directing that a hold separate order be entered to preserve the status quo pending trial

1. 15 U.S.C. § 18 (1964).

2. United States v. International Telephone & Tel. Corp., 306 F.Supp. 766 (D. Conn.1969).
   In an attempt to keep the instant opinion within reasonable bounds and to avoid unnecessary repetition, frequent references will be made herein to the earlier preliminary injunction opinion, to the extent that it is here applicable.
   The earlier opinion, in addition to denying a preliminary injunction to enjoin the proposed ITT–Grinnell merger, also denied a preliminary injunction to enjoin the proposed ITT–Hartford Fire Insurance Company merger and directed the entry of a hold separate order with respect to that merger. 306 F.Supp. at 800–802.
   The instant opinion, except to the limited extent hereinafter indicated, does not deal with the ITT–Hartford merger. That is the subject of a separate action, Civil Action No. 13,320, the trial of which on the merits has been assigned to begin September 15, 1971, by agreement of counsel.

and decision on the merits. An order implementing the preliminary injunction decision was entered October 30, 1969.[3]

It is undisputed that, following ITT's acquisition of all of Grinnell's stock on October 31, 1969, ITT has maintained Grinnell as a separate and viable company in accordance with the Court's order of October 30, 1969.

After a number of pre-trial conferences and following extensive discovery proceedings by both sides, an 18 day trial on the merits began at Bridgeport on September 15, 1970 and concluded on October 30, 1970. The record before the Court consists of the pleadings; some 498 documentary exhibits; extracts from 59 depositions; and the testimony of 53 witnesses who appeared at the trial.

Immediately upon the conclusion of the evidence, the Court heard oral arguments. Counsel thereupon agreed upon a schedule for serving and filing proposed findings of fact and conclusions of law, together with post-trial briefs, the last of which were filed on December 14. As with the earlier preliminary injunction proceedings, the Court has been greatly assisted by the oral arguments, briefs and other post-trial papers from extraordinarily able counsel on both sides.

## PARTIES TO THE ACTION

There are now two parties to the instant action: the government as plaintiff, and ITT as defendant. The action against Grinnell as a defendant was dismissed on September 9, 1970, pursuant to a stipulation between counsel, all of the stock of Grinnell having been acquired by ITT.

For purposes of the instant opinion, the description of the government as a party and of Grinnell as a former party, set forth in the earlier opinion, 306 F Supp. at 770–71, is applicable here.

Likewise, the earlier description of ITT, 306 F.Supp. at 770–71, is sufficient for present purposes, except that the continued growth of ITT, as measured by such indicia as number of employees, sales, assets and acquisitions, should be up-dated as follows: it employs approximately 353,000 persons;[4] during 1969, it had consolidated sales and revenues of slightly less than $5,500,000,000, consolidated net income of $234,000,000 and consolidated assets of approximately $5,200,000,000, at the end of that year;[5] it is the ninth largest industrial corporation in the United States according to Fortune Magazine;[6] approximately 40%–45% of its consolidated sales and revenues and income are from operations outside the United States and Canada;[7] during the period 1955 through 1969, its total consolidated sales and revenues increased from $448,-000,000 to almost $5,500,000,000;[8] during the decade 1960–1969, it acquired 85

---

3. 306 F.Supp. at 799–800.

4. GX 3, p. 6.
   Record references in this opinion will be as follows:

   | | |
   |---|---|
   | GX_____ | Government exhibit. |
   | DX_____ | Defendant exhibit. |
   | Moynagh, Tr._____ | Trial testimony (name of witness, followed by page of typewritten trial transcript). |
   | Groos, DT_____ | Deposition testimony (name of witness, followed by page of typewritten deposition transcript). |
   | Widmar, Tr._____ | Statement by trial counsel (name of counsel, followed by page of typewritten trial transcript). |

5. GX 3, pp. 11, 36.

6. GX 10.

7. GX 3, p. 14.

8. GX 10.

domestic corporations;[9] and at the end of 1969, it had in excess of 200 subsidiaries worldwide engaged in a wide variety of enterprises.[10]

Perhaps the most significant change with respect to the status of ITT since the Court's earlier opinion is that what there were described as the proposed merger agreements, 306 F.Supp. at 772–73, have now been consummated: the ITT-Grinnell merger on October 31, 1969,[11] the ITT-Hartford merger on May 26, 1970.[12]

I

## CLAIM THAT GRINNELL IS THE DOMINANT COMPETITOR IN CERTAIN LINES OF COMMERCE AND IN CERTAIN SECTIONS OF THE COUNTRY

■ The law is well settled that when a company which is the dominant competitor in a relatively oligopolistic market is acquired by a much larger company, such acquisition violates Section 7 of the Clayton Act if the acquired company gains marketing and promotional competitive advantages from the merger which will further entrench its position of dominance by raising barriers to entry to the relevant markets and by discouraging smaller competitors from aggressively competing. The effect of such a merger will be substantially to lessen competition. FTC v. Procter & Gamble Co., 386 U.S. 568 (1967); General Foods Corp. v. FTC, 386 F.2d 936 (3 Cir. 1967), cert. denied, 391 U.S. 919 (1968); United States v. Ingersoll-Rand Co., 320 F.2d 509 (3 Cir. 1963); accord, Allis-Chalmers Mfg. Co. v. White Consolidated Industries, Inc., 414 F.2d 506 (3 Cir. 1969), cert. denied, 396 U.S. 1009 (1970); United States v. Wilson Sporting Goods Co., 288 F.Supp. 543 (N.D.Ill.1968). And see this Court's analysis of the controlling law in its earlier preliminary injunction opinion in the instant case. 306 F.Supp. at 775–76.

The Court turns directly, therefore, to the question whether the evidence establishes that Grinnell is the dominant competitor in the relevant product and geographic markets, i. e. "in any line of commerce in any section of the country."

## (A) LINES OF COMMERCE

For the purpose of determining whether Grinnell is the dominant competitor in the lines of commerce here involved, the Court finds that the following are the relevant product markets or lines of commerce:[13]

### (1) Automatic Sprinkler Devices

Automatic sprinkler devices are among the component parts necessary to construct automatic sprinkler systems for fire prevention. They include sprinklers, alarms and related equipment. They represent a small percentage of the value of an installed sprinkler system.[14]

### (2) Automatic Sprinkler Systems

Automatic sprinkler systems constitute complete installations designed to protect buildings against fire. They are composed of pipe, pipe fittings, pipe hangers, valves and sprinkler devices.

### (3) Power Piping

Power piping systems are used in utility power generating plants and in segments of the process industries, primarily chemical and paper. Such piping is subjected to extreme temperatures and pressures. The power piping industry

---

9. GX 6.

10. GX 4.

11. GX 2, p. 1.

12. GX 9.

13. For a brief description of some of these products, see 306 F.Supp. at 771–72 and 771 n. 3.
The government also has alleged in its complaint a probable lessening of competition in the *power pipe hanger* line of commerce as a result of the ITT-Grinnell merger. The government either has abandoned its claim in this regard, see 306 F.Supp. at 771 n. 3, or it views the power pipe hanger market as a submarket of the pipe hanger market or of the power piping market. *Infra*, pp. 50–51.

14. Groos, DT 12; *compare* GX 368 *with* GX 371.

includes the fabrication and erection of such systems.

### (4) *Pipe Hangers*

Pipe hangers are support devices from which piping is suspended. They are, among other things, components of automatic sprinkler systems and of power piping systems. They vary greatly in type depending on the size and weight of pipe to be suspended and the material from which the support is to hang.

## (B) SECTIONS OF THE COUNTRY

### (1) *Entire United States: For All Lines of Commerce*

█ There is no dispute between the parties that the relevant geographic market for each line of commerce is the national market. The entire United States therefore is the "section of the country" within which the effects of ITT's acquisition of Grinnell upon the relevant lines of commerce are to be measured.

### (2) *Regional Areas: For Installation of Automatic Sprinkler Systems*

The government further claims that, with respect to the installation of automatic sprinkler systems, there are four regional areas, each of which should be regarded as a "section of the country" for the purpose of measuring the impact of this acquisition upon competition in the installation of automatic sprinkler systems. The four regional areas claimed by the government and the Court's finding as to each may be summarized as follows:

#### (a) NEW ENGLAND

The six New England states (with the exception of southwestern Connecticut, which is regarded as part of the New York metropolitan area) constitute a well-defined regional area and an "area of effective competition". Sprinkler installations in this area, with some exceptions, are made by companies with head-quarters located in the area.[15] The Court holds that this is a "section of the country", and therefore a relevant regional area, for the purpose of measuring the effect of the acquisition on the installation of automatic sprinkler systems.

#### (b) STATE OF UTAH

The State of Utah, for essentially the same reasons stated above with respect to the New England states, constitutes a well-defined regional area and an "area of effective competition". The Court holds that this is a "section of the country", and therefore a relevant regional area, for the purpose of measuring the effect of the acquisition on the installation of automatic sprinkler systems.

#### (c) PACIFIC NORTHWEST
(government's claim)

The government claims that a regional area, referred to as the "Pacific Northwest",[16] also constitutes a "section of the country". This area comprises the States of Alaska, Washington, Oregon, part of Idaho (north of a line extended eastward from the Washington-Oregon boundary), and part of Montana (west of, and including, Great Falls, Butte and Helena).

There is no evidence that a single installer of automatic sprinkler systems operates throughout the Pacific Northwest area. Nor is there any evidence, with respect to any installer who has more than one office in this area, that the total area of operation is in any way coterminous with the Pacific Northwest. In short, the record does not support a finding that the Pacific Northwest is an "area of effective competition." [17]

The Court holds that the Pacific Northwest is not a "section of the country" for the purpose of measuring the competitive effect of the acquisition on the installation of automatic sprinkler systems.

---

15. Moynagh, Tr. 244; GX 376–381.

16. GX 424.

17. Ellington, Tr. 841; Larson, Tr. 541; GX 380; GX 410; GX 404; GX 405; GX 407; GX 383; Hinds, Tr. 591.

#### (d) INLAND EMPIRE
###### (government's claim)

The government also claims that a regional area, referred to as the "Inland Empire",[18] constitutes a "section of the country". This area comprises the Pacific Northwest, defined above, except there is excluded the States of Alaska and Oregon and that part of Washington west of the Cascade Mountains. The government would include in the Inland Empire area portions of Montana which are separated by the Continental Divide from the rest of the Inland Empire; and would exclude from the Inland Empire area a portion of Idaho north of the Salmon River and south of the extended Washington-Oregon border—an area which geographically would appear to be more closely related to the so-called Inland Empire than to any other region.

From the foregoing delineation of the Inland Empire, it is clear that it is not a well-defined regional area; and the Court is mindful that Section 7 "does not call for the delineation of a 'section of the country' by metes and bounds as a surveyor would lay off a plot of ground." United States v. Pabst Brewing Company, 384 U.S. 546, 549 (1966). See United States v. Bethlehem Steel Corporation, 168 F.Supp. 576, 602 (S.D.N.Y. 1958). Moreover, the evidence does not show that it is an "area of effective competition". The only sales office of Grinnell located within the Inland Empire competes throughout Montana and in southern, as well as northern, Idaho.[19] Of the four witnesses called by the government who compete in portions of the Pacific Northwest region, none testified that he competed to a significant degree in the Inland Empire area.[20] There is no evidence showing the probable effect of the merger upon competition in the Inland Empire.

The Court holds that the Inland Empire is not a "section of the country" for the purpose of measuring the competitive effect of the acquisition on the installation of automatic sprinkler systems.

### (C) DOMINANCE OF GRINNELL

█ The Court makes the following findings with respect to Grinnell's position in each of the relevant markets, with particular focus upon the government's claim that Grinnell is the dominant competitor in the relatively oligopolistic product markets defined above.

#### (1) *Power Piping Market*

Granted that Grinnell is one of three wholly integrated companies in the power piping industry and accepting arguendo the government's claim that Grinnell is "the largest factor in the power piping industry",[21] the evidence is significantly deficient in establishing Grinnell as the dominant competitor in this market.

A substantial number of companies are capable of *fabricating* power piping systems,[22] at least one of which has a larger fabrication volume than Grinnell.[23] With respect to *erection*, many power piping systems are erected by large engineering and contracting companies,[24] some of which have a larger volume than Grinnell.[25] At least one of Grinnell's competitors in 1969 had a substantially larger combined fabrication-erection volume than Grinnell.[26]

Concededly, no industry statistics or other data have been introduced to show directly the share of the market of any

---

18. GX 425.

19. GX 383.

20. Larson, Tr. 536 et seq.; Hinds, Tr. 589 et seq.; Dahn, Tr. 678 et seq.; Ellington, Tr. 837 et seq.

21. Schwab, DT 16; Prebor, DT 36.

22. Pease, DT 43–47; Carry, DT 8; McCully, DT 5–6, 29.

23. Schwab, DT 13.

24. Carry, DT 13–16; McCully, DT 11–12; Schwab, DT 11–14; Patterson, DT 20, 22; Prebor, DT 38–40.

25. Carry, DT 15–16; Schwab, DT 14.

26. McCully, DT 3.

company in the industry. The closest approximation, based on the most reliable inferences permitted by the record as to the size of the total market, is that Grinnell's total 1969 fabrication and erection contracts in amount of $39,-783,866 [27] represented somewhere between 4% and 13% of the power piping market.[28] This is wide of the mark of dominance.

### (2) *Pipe Hangers Market*

In the pipe hangers market, again no market or industry statistics have been introduced to show the share of the market of any company in the industry. Granted that Grinnell is the leading manufacturer of pipe hangers in the United States, that the five largest companies account for approximately 55% of the total market and that Grinnell's 1969 domestic sales of $15,534,272 represented 20% of the total domestic market [29] (it has been so stipulated), this still does not establish Grinnell as the dominant competitor in a market apparently as widely dispersed, as balanced and with as many competitors as this one.

### (3) *Automatic Sprinkler Devices Market*

In the automatic sprinkler devices market, Grinnell was the largest of 14 domestic manufacturers in 1969, based on its sales of $8,134,590 for that year which represented 23% of the domestic market.[30] Grinnell has three good size competitors, two of whom have grown more rapidly than Grinnell in recent years,[31] and one of whom is believed by its president to be larger than Grinnell

today.[32] There are a number of smaller competitors who maintain a position in the market. Such evidence does not warrant a finding that Grinnell is the dominant competitor in the manufacture of automatic sprinkler devices.

Moreover, since the evidence shows that Grinnell installs practically all of its sprinkler devices, there is no significant competition between Grinnell and other manufacturers in the sale of such devices.[33] Any effect of the acquisition upon competition in the automatic sprinkler devices line of commerce necessarily would be reflected only through the effect such acquisition would have upon competition in the installation of automatic sprinkler systems.

### (4) *Automatic Sprinkler Systems Market*

In the automatic sprinkler systems installation market, the evidence comes closest, of any of the four product markets here involved, to permitting reasonably accurate findings as to Grinnell's share of that market.

In the national market, Grinnell is the largest installer, its 1969 domestic sales of $77,000,000 [34] representing approximately 20% of the total domestic market; [35] and it has two large competitors in the national market.

In the two regional markets which the Court has recognized as "sections of the country" for the purpose of testing the competitive effects of the merger, the government asserts that Grinnell's share of the New England market in 1969 was 24.5% [36] and its share of the State of Utah market in 1969 was 44.3%.[37]

27. GX 1, item 38.

28. Carry, DT 64, 17–18; Pease, DT 135.

29. GX 415.

30. GX 368.

31. Meyer, Tr. 1551, 1576; Fee, Tr. 130–31; GX 1, item 36, shows that Grinnell's sales increased approximately 30% during the period 1965–69.

32. Meyer, Tr. 1551, 1576.

33. Fee, Tr. 133.

34. GX 371 (figures for Grinnell's Canadian and Mexican offices subtracted from total).

35. GX 370B gives Grinnell a market share of 21.2%, a figure based on incomplete data. See GX 370C, App. A; DX E. The 21.2% figure also includes more than 80,000 man hours for a Grinnell subsidiary which no longer exists. GX 370B, n. 1.

36. GX 374B.

37. GX 382.

**28**

The record shows that Grinnell's share of the New England market actually was substantially less than 24.5%, for the total market against which Grinnell's position must be measured does not include (a) some 48 businesses listed as automatic sprinkler installers in the yellow pages of the current New England Telephone Company directory;[38] (b) a number of other businesses identified as automatic sprinkler installers;[39] and (c) sales in New England by persons from outside the New England area.[40]

Grinnell's share of the State of Utah sprinkler installation market in 1969 was 44.3%—a figure which may not be fairly representative of Grinnell's market position in view of its corresponding figures of 14.6% for 1968 and 26.5% for the first eight months of 1970, both periods being subsequent to Grinnell's opening a sprinkler installation office in Utah.[41]

In other areas of the country, moreover, Grinnell is the largest installer; but in a number of important markets Grinnell is not the largest installer, e.g., St. Louis, Los Angeles, Philadelphia, Chicago, Minneapolis-St. Paul, Cleveland, Kansas City, Detroit and New York.[42]

Among the significant factors in this market pattern are (1) the fact that Grinnell's share of the national market declined sharply during the five year period immediately preceding the merger;[43] (2) the fact that Grinnell has a larger share of the national market is not necessarily a measure of its relative market strength in any given area; (3) the fact that Grinnell has a larger share of the national market does indicate that it engages in business throughout the country, as compared to its hundreds of competitors whose businesses are confined to local or regional areas; and (4) the fact that many sprinkler installers of various sizes have grown rapidly despite competition with Grinnell indicates that there are no significant barriers to entering the sprinkler installation business.[44]

Those witnesses at the trial who have had experience in both the manufacture of sprinkler devices and in the installation of sprinkler systems testified that there is no significant advantage to a manufacturer in being engaged also in installation, and vice versa.[45]

Some of Grinnell's installer competitors purchase their sprinkler products from Grinnell;[46] but witnesses called by both sides did not list Grinnell among their principal suppliers,[47] and others did

38. DX E.

39. GX 370, App. A, includes a number of New England companies whose man hours the government has not ascertained.

40. See, e. g., Port. Tr. 1794–95; Aldridge, Tr. 1883.

41. DX D; DX AB–AF.

42. DX C (St. Louis); Carden, Tr. 365–66 (Los Angeles); Connelly, Tr. 945–46 (Chicago); Curran, Tr. 1004 (Philadelphia); Peil, Tr 1071 (Minneapolis-St. Paul); Raskin, Tr. 1747 (Cleveland); Lewis, DT 11 (Kansas City); Glanz, DT 21–22 (Detroit); Hodges, DT 42 (New York City).

43. GX 1, item 36.

44. See, e. g., Escue, Tr. 372, 389 (0 to $1 million in 4 years); Chafin, Tr. 422, 444 (same); Hills, Tr. 1607 (double in 5 years); Colquitt, DT 4–5 (quadruple in 7 years); E. Smith, DT 3–4 (double in 2 years); Corley, DT 31–32 (double in 7 years); Glanz, DT 36–37

(more than double in 5 years); Wilson, DT 8 (same); Barrett, DT 15 (more than sextuple in one office in 5 years).

While there are barriers to entry into the manufacture of sprinkler *devices*, such barriers are unrelated to the dominance of any manufacturing company and there is no evidence that they will be affected by ITT's acquisition of Grinnell. See Fee, Tr. 77–78.

45. See Somers, Tr. 1467–68; Meyer, Tr. 1558 (no advantage for manufacturer to engage in installation). And see Meyer, Tr. 1558; Hauth, Tr. 1665–66 (no advantage for installer to engage in manufacturing).

46. Hodges, DT 11–12; Coleman, Tr. 160–61; Peil, Tr. 1045; Aldridge, Tr. 1883; Grenning, DT 13; Crook, DT 9, 35–36.

47. Dahn, Tr. 704; Connelly, Tr. 945; Krumm, Tr. 1776; Crook, DT 9; Barrett, DT 4; Glanz, DT 18–21; Akonom, DT 11–13; Corley, DT 58.

not consider themselves dependent on Grinnell for their sprinkler products.[48]

While Grinnell sprinkler devices frequently are specified by architects and others in connection with sprinkler system installations, such specifications almost invariably are on an "or equal" basis.[49] The evidence clearly establishes that the specification of a particular brand of sprinkler device, whether on an "or equal" basis or otherwise, provides no significant competitive advantage to the company whose product is specified nor any disadvantage to a company whose product is not specified.[50]

Upon the entire record, the Court finds that the evidence does not establish that Grinnell is the dominant competitor in the automatic sprinkler systems installation market, i. e., neither in the national market nor in either of the two relevant regional markets.

### SUMMARY UNDER THIS SECTION

To summarize regarding the relevant product and geographic markets here involved and the government's claim that Grinnell is the dominant competitor in such markets, the Court concludes as follows:

(A) The following lines of commerce or product markets have been established:

> Automatic sprinkler devices
> Automatic sprinkler systems
> Power piping
> Pipe hangers

(B) With respect to each of the above listed lines of commerce, the entire United States is a relevant geographic market, and therefore a section of the country, within which the competitive effects of the acquisition on each line of commerce appropriately may be measured.

With respect to the installation of automatic sprinkler systems as a line of commerce, each of the following regional

areas also constitutes a section of the country for the purpose of measuring the competitive effects of the acquisition:

> New England
> State of Utah

The claimed Pacific Northwest and Inland Empire regional areas do not constitute sections of the country for this purpose.

(C) As for the government's claim that Grinnell is the dominant competitor in the relatively oligopolistic product markets set forth above, the Court holds that the evidence establishes that Grinnell is not the dominant competitor in any relevant product or geographic market.

## II

### CLAIM THAT MERGER WILL CONFER MARKETING AND PROMOTIONAL COMPETITIVE ADVANTAGES UPON GRINNELL

### [REGARDING AUTOMATIC SPRINKLER DEVICES AND AUTOMATIC SPRINKLER SYSTEMS MARKETS]

The Court having concluded, upon the entire record, that the evidence does not support the government's claim that Grinnell is the dominant competitor in any of the relevant markets, that should end the case. A bolder Court would enter judgment for defendant and proceed no further.

In view of the likelihood of appellate review and having regard for the enormous expenditure of time and effort on the part of all concerned with respect to the remaining issues in the case, it does appear prudent for the Court to decide such issues and to make appropriate findings and conclusions thereon.

Before doing so, however, the Court believes that it would be remiss if it did not state unequivocally that, in its opin-

48. Larson, Tr. 586; Lowery, Tr. 1490; Hills, Tr. 1608; Hauth, Tr. 1669–70; Groos, DT 48; Hawley, DT 5–6.

49. Chafin, Tr. 448–49; Callison, Tr. 1035; Lowery, Tr. 1498–99; Ford, Tr. 1590; Brown, Tr. 1706–07; Krumm, Tr. 1782.

50. Chafin, Tr. 454–55; Lowery, Tr. 1500; Ford, Tr. 1590; Brown, Tr. 1707; Krumm, Tr. 1782–83.

ion, this is not even a close case on the issue of Grinnell's dominance. It is not merely a case where the government has failed to sustain its burden of proof on that issue; it is a case where the over-whelming preponderance of the credible evidence clearly establishes that Grinnell is *not* the dominant competitor in *any* relevant market. Having lived with this case for nearly a year and a half, having heard scores of witnesses testify and hav-ing carefully studied hundreds of docu-ments and thousands of pages of deposi-tion and trial testimony, this Court is left with an unusually firm conviction that Grinnell, although a large and lead-ing competitor, clearly is not a *dominant* competitor within the recognized mean-ing of that term in the antitrust field.

■ Despite that conviction, however, the Court will assume arguendo in this section of the opinion that Grinnell is a dominant competitor in the automatic sprinkler devices and installation mar-kets,[51] and will proceed to consider the government's claim that Grinnell as such will gain marketing and promotional com-petitive advantages from the merger in the following specific respects: [52]

(A) Package Or System Selling

(B) Affiliation With Hartford

(C) Access To ITT's Financial Re-sources And Advertising

(D) Foreign Expansion

(E) Vertical Foreclosure

(F) Central Stations

(G) Reciprocal Dealing

## (A) PACKAGE OR SYSTEM SELLING

The government claims that the merg-er will give Grinnell a competitive mar-keting advantage by creating an oppor-tunity for Grinnell to include additional products in its automatic sprinkler line and to engage in package or system sell-ing. In short, the government contends that this is a mixed or product extension conglomerate merger. Such a merger has been defined as one involving the acquisition of a company manufacturing or selling a product "related to a prod-uct or products of the acquiring firm because it can be produced with much the same facilities, sold through the same distribution channels, or made a part of the same research and development efforts." Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1315 (1965). See FTC v. Procter & Gamble Co., 386 U.S. 568, 577–78 (1967); Allis-Chalmers Mfg. Co. v. White Consolidated Indus-tries, Inc., 414 F.2d 506, 518 (3 Cir. 1969), cert. denied, 396 U.S. 1009 (1970); General Foods Corp. v. FTC, 386 F.2d 936, 944 (3 Cir. 1967), cert. denied, 391 U.S. 919 (1968); United States v. Wil-son Sporting Goods Co., 288 F.Supp. 543, 548 (N.D.Ill.1968).

It is undisputed that Grinnell has not in fact engaged in package or system sell-ing during the period of more than a year since the merger was consummat-ed.[53] Nor does the government claim to have adduced evidence that this competi-tive practice is planned or that it is im-minent. As stated in its brief, "The Government does not contend that ITT–Grinnell will exercise these opportunities [for product extension] tomorrow or even next year, but what is crucial is the fact that these opportunities are pres-ent." [54]

■■ While the line between "possi-bilities", "certainties" and "probabili-

---

51. Government counsel, with commendable candor, has informed the Court that his chief concern is directed toward the au-tomatic sprinkler installation market (Widmar, Tr. 2180).

The Court nevertheless will rule upon the government's claims with respect to the other product markets.

52. The government does not contend that any *one* of these marketing and promo-tional competitive advantages will result in a substantial lessening of competition; it contends that their cumulative effect will have anticompetitive consequences (Widmar, Tr. 9).

53. The same applies to the other marketing and promotional competitive practices dis-cussed below.

54. Government's Post-Trial Brief, p. 74.

ties" may be difficult to draw in a given case, such difficulty does not relieve the Court of its obligation to do so in accordance with established legal standards, as the Court pointed out in its earlier opinion. 306 F.Supp. at 774. Section 7 is not concerned with *possibilities*. "The statute is concerned only with those mergers which may have demonstrable and substantial anticompetitive effects." United States v. Atlantic Richfield Co., 297 F.Supp. 1061, 1066 (S.D.N.Y.1969); see Brown Shoe Co. v. United States, 370 U.S. 294, 317 (1962). Nor is Section 7 concerned with *certainties*; since it is designed to stop anticompetitive practices "in their incipiency", there is no requirement that "the anticompetitive power manifest itself in anticompetitive action before § 7 can be called into play." FTC v. Procter & Gamble Co., *supra*, at 577. Upon its face, Section 7 makes it clear that the statute is concerned with *probabilities*. Brown Shoe Co. v. United States, *supra*, at 323. The statutory standard is whether it is *probable* that a merger will have an anticompetitive effect, viz. whether its effect *"may be* substantially to lessen competition" (Emphasis added).[55]

The government's package or system selling claim at the time of the preliminary injunction hearing was directed almost entirely to an attempt to show that automatic sprinklers could be included in an overall plumbing, heating and air conditioning package. 306 F.Supp. at 777. The evidence at the trial on the merits established beyond question that this type of package would not significantly enhance Grinnell's sprinkler business;[56] and it demonstrated that sprin-

kler systems never have been packaged with other construction products by Grinnell or by other sprinkler companies, despite abundant opportunities to do so.[57]

In the light of such evidence, the government appears now to have abandoned its claim that there is any likelihood, much less a probability, that Grinnell sprinkler systems will be packaged with ITT plumbing, heating and air conditioning products in such a way as to benefit Grinnell sprinkler sales.

Instead, the government now has cast its package or system selling claim in more sophisticated terms and with new radiations.

The government's primary claim at trial was that a single mechanical contracting company bidding sprinkler work together with plumbing, heating and air conditioning installations would have an advantage over a specialized sprinkler contractor bidding sprinkler work only. The premise upon which the government's argument in this respect rests— that ITT as a mechanical contractor will engage in installation of plumbing, heating and air conditioning equipment, or will make it possible for Grinnell to do so —is of doubtful validity. The evidence shows that ITT is not engaged in the mechanical contracting business of installing plumbing, heating or air conditioning systems; that it has never contemplated entering that business; and that there are compelling business reasons why it is most improbable that ITT ever would enter that business, e. g., the fact that ITT manufactures some air conditioning and heating hardware would strongly deter its entry into the mechanical contracting business, despite the government's claim to the contrary.[58]

55. This distinction between *possibilities*, *certainties* and *probabilities* applies of course to the Court's evaluation of the evidence with respect to each of the alleged marketing and promotional competitive advantages to be considered in this section of the opinion.

56. Hills, Tr. 1616–17; Port, Tr. 1796; Aldridge, Tr. 1895–96; Taylor, Tr. 1944.

See Ellington, Tr. 862–63; Glanz, DT 13.

57. Hodges, Tr. 2040, 2061–62; Corley, DT 57; Somers, Tr. 1457; Meyer, Tr. 1544–45.

58. Woerthwein, Tr. 1828–29; Will, Tr. 1852–53, 1857. *Compare* Petronis, Tr. 1334.

An understanding of the specialized character of sprinkler installation work is necessary properly to evaluate the government's claim in this respect. The majority of significant sprinkler companies throughout the country specialize in sprinkler work only, and do not engage in plumbing, heating or air conditioning work.[59] Most sprinkler work is awarded on the basis of bids that are confined to sprinkler installations. Most general contractors invite and receive separate sprinkler bids, rather than requiring that sprinkler work be bid to mechanical contractors for inclusion in a package bid.[60] Such preference as general contractors may have for dealing with mechanical contractors able to offer a package including sprinklers stems from a desire for installation coordination [61]—a preference which does not require a sprinkler contractor to be a mechanical contractor as well in order to avail himself of it.[62] The advantage, therefore, to a mechanical contractor of being engaged in the sprinkler business, is of doubtful significance, if any.[63] Accordingly, even if there were evidence (and there is none) that ITT or Grinnell as a result of the merger were to engage in mechanical contracting work, the Court would be unable to find that Grinnell thereby would gain a substantial competitive advantage in its sprinkler business.

A further radiation of the government's package or system selling claim at trial was that Grinnell would be able to offer to mechanical contractors or others a package consisting of an *installed* sprinkler system together with *uninstalled* plumbing, heating and air conditioning products, having in mind that other ITT companies manufacture such products. The Court finds the government's claim that Grinnell would gain an advantage over its competitors from such a package to be wholly unsupported by the evidence. Prior to its acquisition by ITT, Grinnell sold hundreds of products to the construction industry but never packaged them with sprinklers [64]—a course it was not inhibited from pursuing had it been thought to be advantageous. No witness at trial, including

The Court has carefully weighed, in the context of the entire record, the evidence that during the past two years a Grinnell subsidiary has engaged in mechanical contracting work on three projects in the South. The Court is satisfied that this activity appropriately may be regarded as the exception that proves the rule: it was necessitated by special problems having nothing to do with the ITT–Grinnell merger; the record is uncontroverted that such activity will not be expanded; and such activity had no impact whatsoever upon Grinnell's automatic sprinkler business. Pease, Tr. 2083–88.

59. Moynagh, Tr. 268–69; Carden, Tr. 354–55; MacDonald, Tr. 418–19; Callison, Tr. 1034; Lowery, Tr. 1491; Ford, Tr. 1581–82; Brown, Tr. 1702; Aldridge, Tr. 1895; Corley, DT 53–54.

60. Moynagh, Tr. 265–66; Carden, Tr. 320; Escue, Tr. 382; Stevens, Tr. 532–33; Smith, Tr. 827; Lowery, Tr. 1491; Ford, Tr. 1581; Krumm, Tr. 1777; Aldridge, Tr. 1889; Taylor, Tr. 1955; Corley, DT 52; White, DT 10.

61. Escue, Tr. 382; Stevens, Tr. 508–09; Jose, Tr. 668–71; Connelly, Tr. 927–28; McGilvray, Tr. 961; Noble, Tr. 1088–89.

62. The mechanical contractor's installation coordination which stems from a mechanical "package" can be utilized by a sprinkler contractor through bidding to the mechanical contractor. See Noble, Tr. 1089–90; McGilvray, Tr. 991–92; E. Smith, DT 21; Corley, DT 48; MacDonald, DT 19; Crook, DT 26. It is also evident that an independent sprinkler contractor may have an advantage over a mechanical contractor with its own sprinkler division. The sprinkler contractor can bid to several mechanical contractors. The mechanical contractor can submit but one package bid which includes sprinklers. Mechanical contractors do not accept sprinkler bids from other mechanical contractors. See Raskin, Tr. 1728–29.

63. In this connection, the Court has taken into account the evidence at trial that some mechanical contractors who offer a package of plumbing, heating, air conditioning and sprinkler work have a bidding advantage over a contractor who bids only sprinkler work; as well as the evidence to the contrary.

64. Hodges, Tr. 2040, 2061–62; Corley, DT 57.

some with experience in both mechanical contracting and sprinkler installation, testified that he would be interested in or concerned about such a package.[65] Such witnesses did make it clear that packaging requires products with a functional relationship to one another.[66] Mechanical contractors would have no interest in purchasing such a package;[67] nor would the ability of ITT–Grinnell to offer such a package (assuming evidence not adduced) give them any competitive concern.[68] Grinnell's sprinkler contractor competitors see neither a demand for nor any advantage in being able to offer such a package.[69] Grinnell's sprinkler device manufacturer competitors have seen no advantage in packaging with sprinklers other products they manufacture.[70] An experienced manufacturer of mechanical hardware believes such a package would not be feasible to offer.[71]

In short, the government has failed to show that there is any likelihood that there will be a "significant integration in the production, distribution or marketing" of automatic sprinkler systems with other ITT companies. General Foods Corp. v. FTC, *supra*, at 944. The Court finds that the record sharply distinguishes the instant case from the situations in FTC v. Procter & Gamble Co., *supra*, General Foods Corp. v. FTC, *supra*, and United States v. Wilson Sporting Goods Co., *supra*, where substantial merger advantages were shown in terms of advertising or use of common distribution outlets.

The Court holds that the government has not sustained its burden of establishing that Grinnell will gain any competitive advantage from the merger in the form of opportunities for package or system selling.

## (B) AFFILIATION WITH HARTFORD

The government also claims that Grinnell will gain competitive marketing advantages from the ITT–Grinnell merger through its affiliation with Hartford. The government's claim in this respect is based upon the close relationship between the fire insurance and automatic sprinkler industries; and more particularly upon the fact that the prospect of a substantial reduction in insurance rates frequently is a motivating factor, among others,[72] in reaching a decision to install a sprinkler system.[73]

Whether, based upon these known facts, the evidence has established that Grinnell will gain substantial advantages over its competitors by virtue of Grinnell's affiliation with Hartford, is the central factual issue for determination here.

A large portion of the evidence upon this issue focused upon the government's contention that Grinnell will gain a competitive advantage from its affiliation with Hartford by receiving leads for sprinkler business from Hartford and from Hartford agents, and by becoming the beneficiary of recommendations to potential sprinkler customers from such sources. This is one of the major areas in the trial testimony where it has been necessary for the Court as the fact finder to apply the recognized tests for determining the credibility of witnesses and the weight to be attributed to their testimony.[74]

65. Connelly, Tr. 923, et seq.; McGilvray, Tr. 956, et seq.; Hawley, DT 11–12; Glanz, DT 47; Offutt, DT 12–13; E. Smith, DT 8–9, 11.

66. Connelly, Tr. 950–51; Petronis, Tr. 1334–35, 1344; Newton, DT 49.

67. Hawley, DT 11–12.

68. E. Smith, DT 8–9.

69. Lowery, Tr. 1492–93; Ford, Tr. 1584; Hills, Tr. 1618–19; Port, Tr. 1796–97; Groos, DT 20.

70. Somers, Tr. 1457; Meyer, Tr. 1544–45.

71. Will, Tr. 1857.

72. *E.g.*, Fee, Tr. 127–29; Stevens, Tr. 516; Somers, Tr. 1472; Meyer, Tr. 1563–64; Hauth, Tr. 1677.

73. Fee, Tr. 96–97; Hauth, Tr. 1684; Raskin, Tr. 1758.

74. *Infra*, p. 51.

There was some testimony that a few sprinkler installers have received a substantial amount of their business from insurance sources. As to those witnesses who so testified, some admitted that their companies had unusual capabilities and specializations;[75] others were unable to substantiate their estimates on cross examination;[76] and some demonstrated that their estimates included business clearly not derived from any insurance source.[77] The one government witness who came closest to specifying sprinkler business which he believed originated from insurance sources happened to be one of the trial witnesses whose testimony raised very grave doubts with the Court as to his credibility; indeed, defendant's evidence very substantially refuted his testimony in material respects.[78]

There also was testimony that in some instances sprinkler contractors hear of prospective sprinkler business from insurance agents and that insurance agents occasionally refer their clients to sprinkler contractors. Most of the witnesses on this subject, however, testified that when sprinkler leads do come from insurance sources they come from independent agents rather than from insurance companies.[79] There was no evidence that Hartford itself is in a position to give any significant number of insurance leads or recommendations to Grinnell.[80]

The consensus of those witnesses who testified on the subject of insurance leads, and particularly those who struck the Court as being worthy of belief, was that insurance leads and recommendations actually play an insignificant role in the sprinkler industry.[81] Such leads usually relate to existing buildings rather than to new structures;[82] and sprinkler work on existing buildings is a minor part of sprinkler contracting,[83] believed by sprinkler contractors to be relatively undesirable work.[84]

The significance of insurance leads furthermore must be evaluated in light of the highly competitive nature of the sprinkler business; and that applies to sprinkler work originating from insurance sources.[85] Sprinkler contracts are awarded for the most part on the basis of competitive bids. Recommendations of an insurance company or its agents accordingly have little or no effect. The

---

75. Chafin, Tr. 444–45; Sweitzer, Tr. 883.

76. Carden, Tr. 317, 342–43; Larson, Tr. 553, 573; Hinds, Tr. 600–01, 639–44.

77. Carden, Tr. 344–54; Larson, Tr. 573–82.

78. *Compare* Beel, GX 417 *with* DX LL through ZZ *and* DX AM through AQ.

79. *E.g.,* Moynagh, Tr. 250; Jose, Tr. 674; Callison, Tr. 1026; Hauth, Tr. 1678.

80. See GX 1, item 9; Potter, Tr. 2069; Ink, DT 18–19.

81. Moynagh, Tr. 269–71 (insurance leads cover 1.5% to 2% of his total sales); McGilvray, Tr. 973 (insurance contacts were "very limited"); Escue, Tr. 379–80 (two jobs from insurance leads in four years); Curran, Tr. 1005 (received insurance inquiries only "occasionally"); Jose, Tr. 675 (closed only one or two insurance jobs in two years); Colquitt, DT 27–28 (one insurance lead in past year); Crook, DT 37–38 (no concern over insurance leads); MacDonald, DT 10 (no insurance leads in over one year);

Coleman, Tr. 187 (does not follow up insurance leads). See also: Lowery, Tr. 1494–95; Ford, Tr. 1587; Hills, Tr. 1611; Brown, Tr. 1703; Raskin, Tr. 1731; Krumm, Tr. 1778; Port, Tr. 1797; Aldridge, Tr. 1896; Taylor, Tr. 1945; White, DT 5; Lawton, DT 25; Groos, DT 27.

82. Moynagh, Tr. 270; Chafin, Tr. 455; Dahn, Tr. 690; Sweitzer, Tr. 890–92; Peil, Tr. 1077; Augustine, Tr. 1172–73; Hauth, Tr. 1678–79; Brown, Tr. 1704; Krumm, Tr. 1780; Port, Tr. 1798; Aldridge, Tr. 1897; Grenning, DT 74; Harms, DT 30.

83. Moynagh, Tr. 264; Lowery, Tr. 1490; Ford, Tr. 1580; Hauth, Tr. 1670; Raskin, Tr. 1728; Krumm, Tr. 1776; Aldridge, Tr. 1888.

84. Moynagh, Tr. 266–67; Krumm, Tr. 1776–77; Aldridge, Tr. 1888.

85. Larson, Tr. 583; Jose, Tr. 675; Curran, Tr. 1009; Lowery, Tr. 1495–96; Ford, Tr. 1587; Raskin, Tr. 1755–56; Krumm, Tr. 1779; Harms, DT 29–30; E. Smith, DT 21.

controlling factor is the bid rather than a recommendation.

Many automatic sprinkler systems are installed in large buildings insured by insurance pools or groups of insurance companies which are not subject to the control of a particular insurer.[86] Such pools give sprinkler specifications but they do not recommend manufacturers or installers.[87] There is no basis for believing that such insurance pools would recommend Grinnell sprinklers simply because of Grinnell's affiliation with Hartford.

Insurance agents testified that even when asked to recommend sprinkler contractors they refer the customer to the yellow pages of the telephone directory or recommend that they contact four to six reputable companies.[88] Other insurance agents called by the government testified that, even though they might recommend a sprinkler company affiliated with an insurance company which they represented,[89] they nevertheless would advise their clients to obtain competitive bids and would expect them to do so.[90]

In the light of the foregoing evidence with respect to the relationship generally in the industry between insurance leads and sprinkler work, the Court turns to the evidence specifically regarding Hartford and Grinnell in connection with this marketing practice. All of Hartford's fire insurance is written through some 13,228 independent agents and 942 brokers.[91] They typically act for a number of different insurance companies.[92] Characteristically they value their independence and they want their clients to understand that they are acting in their clients' best interests.[93] Despite the availability of some 14,170 Hartford agents and brokers, the government was not able to adduce testimony from any of them to the effect that they would favor Grinnell as a result of its affiliation with Hartford. Nor was there any evidence that any Hartford agent or broker had reason to believe he would be favored by Hartford in return for his favoring Grinnell; and there was evidence just to the contrary.[94]

Some indication of the actual effect of an affiliation between a property and casualty insurance company and a large manufacturer of automatic sprinkler devices may be gleaned from the results of the acquisition of Star Sprinkler Corporation by the INA Corporation in 1968.[95] Star distributes its products through some 140 licensees.[96] A number of insurance witnesses who deal with INA testified that the INA–Star merger has had no effect on their practices so far as sprinkler companies are concerned.[97] None of the Star licensees called by either the government or defendant testified that he had received any insurance leads or recommendations or other competitive benefits as a result of the INA–Star merger; and some of them disclaimed any such effect.[98] Despite the availability of some 140 Star licensees, the

86. Raskin, Tr. 1739; Retelle, Tr. 1969–70, 1982; Smythe, Tr. 2000–01; Abbott, Tr. 2020; Potter, Tr. 2072–73.

87. Meyer, Tr. 1569; Retelle, Tr. 1979–80; Abbott, Tr. 2019–20; Potter, Tr. 2071–72; DX BB, ¶¶ 5–7; DX DD, ¶¶ 2, 3.

88. Retelle, Tr. 1979; Smythe, Tr. 1995; Abbott, Tr. 2013–14.

89. Augustine, Tr. 1188; Slawsby, Tr. 1229.

90. Augustine, Tr. 1206; Slawsby, Tr. 1237. See also Harms, DT 29–30; DX U, AJ.

91. GX 1, item 11.

92. GX 1, item 11; Hauth, Tr. 1679; Wyatt, DT 13–15.

93. Slawsby, Tr. 1234; Smythe, Tr. 1998; Abbott, Tr. 2022. See also DX CC, ¶ 4.

94. Smythe, Tr. 1999–2000; Abbott, Tr. 2017–22. See also Potter, Tr. 2070–71.

95. Meyer, Tr. 1543, 1549.

96. Meyer, Tr. 1545.

97. Smythe, Tr. 1998–2000; Abbott, Tr. 2017–18.

98. Carden, Tr. 303; Smith, Tr. 835–36; Sweitzer, Tr. 908–09; Curran, Tr. 1004; Port, Tr. 1799–1800; Aldridge, Tr. 1897–98; Harms, DT 5–8; MacDonald, DT 10; Offutt, DT 19; E. Smith, DT 13; Wilson, DT 29–30.

government adduced no evidence that either INA or Star had requested INA agents to favor Star licensees in any way, that any INA agent had done so, or that any INA agent believed he could benefit in his relations with INA by doing so. Two witnesses called by the government who were *not Star licensees* testified they had received leads from insurance agents representing INA despite the fact that these witnesses had competitors who *were Star licensees*.[99]

The chief executive of Star testified that when Star became affiliated with INA he decided that it would not be in the best interests of Star to draw upon its relationship with INA to promote the sale of Star sprinklers or otherwise to rely upon the identification of Star with INA.[100] This is substantially the same view held by the head of Grinnell's sprinkler operations, namely, that if Grinnell were to receive favored treatment from Hartford this would result in a negative reaction from the rest of the insurance industry, to Grinnell's detriment.[101]

This leads to the evidence which strikes the Court as having the most probative force of all upon the issue of whether Grinnell will gain a substantial competitive advantage from its affiliation with Hartford, namely, that it simply would not be in Grinnell's business interests to attempt to exploit in any way its relationship with Hartford. In short, the evidence overwhelmingly demonstrates that Grinnell would stand to lose far more than it could gain from any exploitation of the Hartford affiliation.

The evidence on this is concise but convincing. While Hartford is a large insurance company,[102] its total share of the domestic fire insurance market is only 4.4% and its total share of the sprinklered risk market is approximately 2.4%.[103] The government's own witnesses recognized the desirability of maintaining good relations with as many different insurance sources as possible.[104] The evidence shows that too close an alliance between Hartford and Grinnell would cause other insurance interests to be less friendly with Grinnell and less inclined to furnish leads to, or to make recommendations of, Grinnell;[105] testimony by witnesses called by both sides established beyond any question that the result of any such relationship would be to deter non-Hartford agents from recommending Grinnell sprinklers, although under other circumstances they might have made such a recommendation.[106]

As for the government's relatively incidental claims of other advantages[107] to be gained by Grinnell from its affiliation with Hartford (i. e. other than receiving insurance leads for sprinkler business), the Court does not believe that they warrant detailed discussion other than to note that the Court finds that the evidence does not support the government's contentions with respect to the alleged advantages of obtaining tentative sprinklered rates from insurance rating bureaus;[108] of manipulating rate struc-

---

99. Hinds, Tr. 616–17; Connelly, Tr. 943.

100. Meyer, Tr. 1569.

101. Hodges, DT 112.

102. GX 418.

103. GX 1, item 12.

104. Fee, Tr. 144; Corley, DT 44–45.

105. Coleman, Tr. 228; Dahn, Tr. 712; Peil, Tr. 1078; Lewis, DT 14; MacDonald, DT 11. *Compare* Fee, Tr. 113 (his company's licensees reluctant to disclose prospects to finance companies lest the names be divulged to their competitors).

106. Abbott, Tr. 2016–17; Smythe, Tr. 2003; Slawsby, Tr. 1234–35; Augustine, Tr. 1207.

107. These incidental claims are urged by the government here distinctly as secondary to its main claim relating to insurance leads, as at the time of the preliminary injunction hearing. 306 F.Supp. at 778 n. 23.

108. Access to the tentative sprinklered rate is not important for the sprinkler contractor. Lowery, Tr. 1497; Hills, Tr. 1613; Brown, Tr. 1704–05; Raskin, Tr. 1743–44; Krumm, Tr. 1781; Port, Tr. 1800; Aldridge, Tr. 1898–99; DX T.

tures or sprinkler standards to favor Grinnell;[109] or of providing an insurance-sprinkler package.[110] Nor does the record even remotely support the government's claim that the ITT-Hartford merger may spark other insurance-sprinkler combinations and foster a trend toward concentration;[111] and much less does the record support the government's claim that such a supposititious trend would tend to lessen competition in the sprinkler industry.

The Court holds that the government has not sustained its burden of proving that Grinnell will gain competitive marketing advantages from the ITT-Grinnell merger through its affiliation with Hartford.

## (C) ACCESS TO ITT'S FINANCIAL RESOURCES AND ADVERTISING

The government further claims that Grinnell will gain a competitive marketing advantage through access to ITT's financial resources and comprehensive advertising program; more particularly, it is claimed that through ITT's finance companies Grinnell will be able to finance the purchase and leasing of sprinkler systems on a larger scale than it now does, and that through access to ITT's advertising expertise and experience Grinnell will be able to expand its advertising and sales promotion programs.

The question naturally arises, in light of this claim, whether Grinnell *needs* such financing and advertising help. The answer provided by the trial record in this case is unequivocally in the negative.

The evidence is uncontroverted that Grinnell already is in a position to offer credit and leasing arrangements to sprinkler customers without financing assistance from ITT and is capable itself of expanding such financing as broadly as is desirable commercially.[112]

Financing from non-sprinkler company sources is available to purchasers with satisfactory credit.[113] Finance companies such as Phillips and CIT regularly finance sprinkler installations.[114]

Actually, as the government witnesses testified, sprinkler work requiring financing is not considered desirable work,[115] and most sprinkler companies receive very few inquiries regarding financing.[116] One of the largest manufacturers of sprinkler devices, Star Sprinkler Corporation, offers financing services through CIT to its 140 licensees; Star does the paper work and has widely publicized the availability of such financing; but Star's licensees have shown almost no interest in it.[117]

The Court has taken into account the evidence of instances where sprinkler companies turned down prospective sprinkler work because of their inability

A sprinkler contractor can easily calculate an approximate sprinklered rate from accessible information. Meyer, Tr. 1565–66; Hills, Tr. 1613–14; Raskin, Tr. 1744; Port, Tr. 1800; Retelle, Tr. 1974–75; Augustine, Tr. 1197; Wyatt, Tr. 2033; Potter, Tr. 2073. Rating bureaus will provide a tentative sprinklered rate to a sprinkler contractor upon request. Meyer, Tr. 1567; Ford, Tr. 1588; Hauth, Tr. 1680–81; Brown, Tr. 1704; Aldridge, Tr. 1898. Rating bureaus would be reluctant to provide tentative sprinklered rates on a wholesale basis. Augustine, Tr. 1195; Retelle, Tr. 1977–79.

109. Meyer, Tr. 1569; Retelle, Tr. 1979–80; Abbott, Tr. 2019–20; Potter, Tr.

2071–72; DX BB, ¶¶ 5–7; DX DD, ¶¶ 2, 3.

110. Abbott, Tr. 2017; Cohn, DT 9–11; Fleming, DT 23. *Compare* Fee, Tr. 101–02.

111. Government's Post-Trial Brief, p. 51.

112. Hodges, Tr. 2048; Luke, DT 44.

113. Larson, Tr. 583.

114. Port, Tr. 1802; Grenning, DT 53; Barrett, DT 5.

115. Moynagh, Tr. 266; Ellington, Tr. 864.

116. *E.g.*, Lowery, Tr. 1497–98; Ford, Tr. 1589; Brown, Tr. 1706; Krumm, Tr. 1781.

117. Meyer, Tr. 1567–68; Carden, Tr. 363; Aldridge, Tr. 1892–93.

to finance it;[118] but there is no evidence of such sprinkler work going to a competitor which itself was able to finance it.[119]

With respect to advertising, the Court finds that it simply is not a significant factor in the sprinkler industry. Witnesses from various sprinkler companies, including Grinnell, testified that advertising is unimportant in the award of sprinkler work;[120] that it is not worthwhile;[121] and, even if they were in a position to invest more in advertising, that they would not do so.[122]

Grinnell has had an advertising budget of less than $100,000 for automatic sprinkler systems—far less than it could provide itself if in its business judgment it considered more advertising prudent.[123] Star Manufacturing Company's entire advertising budget is $5,600[124]— again indicating the relative unimportance of advertising in the sprinkler industry.

Upon this record the Court finds that Grinnell's access to ITT's financial resources and more comprehensive advertising program cannot be viewed realistically as a competitive advantage since Grinnell is fully capable itself of providing financing, leasing and advertising to the extent business judgment dictates, even absent the ITT-Grinnell merger. Cf. United States v. Wilson Sporting Goods Co., 288 F.Supp. 543, 553 (N.D.Ill. 1968).

The Court holds that the government has not sustained its burden of proving that the merger will confer upon Grinnell a competitive marketing advantage through access to ITT's financial resources and advertising program.

### (D) FOREIGN EXPANSION

The government also claims that the ITT-Grinnell merger will give Grinnell a competitive advantage in the form of ITT assistance to Grinnell in its overseas expansion, thus leading to foreclosure of Grinnell's competitors from foreign markets[125] and, since profits earned abroad may be used to compete domestically, further resulting in lessening of competition in the domestic market.

The record clearly shows that prior to the merger Grinnell had already expanded into Europe;[126] and that it had done so without the type of assistance ITT might be in a position to provide, such as local contacts, staff support and labor relations.[127]

The leading sprinkler companies with which American companies must compete in Europe are European companies rather than Grinnell.[128] In fact, Grinnell is under a disability in the European market because another company has the rights to the Grinnell name in connection with sprinklers in Europe.[129]

The testimony of the only government witness who testified to a personal concern over the possibility of Grinnell's

118. *E.g.*, Moynagh, Tr. 255–56; Cardin, Tr. 324; Escue, Tr. 384–85.

119. *Compare* Hinds, Tr. 632–33, *with* Hodges, Tr. 2042–43. See also Peil, Tr. 1071.

120. Lowery, Tr. 1505; Brown, Tr. 1709; Aldridge, Tr. 1891; Taylor, Tr. 1951; Hodges, DT 135–36; Crook, DT 26–27.

121. Ford, Tr. 1592.

122. Port, Tr. 1803–04.

123. GX 348.

124. Meyer, Tr. 1558.

125. The Court noted in its earlier preliminary injunction opinion some doubt as to the legal basis for the government's claim in this regard, since Section 7 proscribes acquisitions the effect of which may be substantially to lessen competition "in any section of the country". 306 F.Supp. at 780. In view of evidence adduced by the government at the trial on the merits that profits earned abroad may be used to compete domestically, the Court accepts the legal basis for the government's claim; but, for reasons stated more fully below, the Court finds that the evidence does not support the government's claim of foreclosure of Grinnell's competitors from foreign markets.

126. Hodges, Tr. 2045–46; Rison, DT 52–53, 56–58.

127. DX AA, p. 2; Luke, DT 44.

128. Hodges, Tr. 2047; Groos, DT 17.

129. Hodges, Tr. 2047–48.

gaining an advantage in the European market from its affiliation with ITT must be taken with a grain of salt by the Court in evaluating his credibility and in determining what weight is to be given his testimony;[130] for his trial testimony expressing his concern in this respect appears to have been interjected as an afterthought and following no such suggestion in his prior affidavit and deposition when he was afforded an opportunity to state his objections in full.[131]

In any event, in view of the evidence that the automatic sprinkler market in the United States is just coming into its own [132] and is likely to grow dramatically in the future,[133] the Court finds that any substantial expansion of Grinnell in foreign countries, with or without ITT assistance, would probably benefit all United States sprinkler companies.[134] In short, far from foreclosing competitors, such expansion would create a larger market to be shared by all.

The Court holds that the government has not sustained its burden of establishing that the merger will foreclose Grinnell's competitors from foreign markets and thus result in a lessening of competition in the domestic market.

## (E) VERTICAL FORECLOSURE

The government also claims that the ITT–Grinnell merger will have some of the characteristics of a vertical merger in that it will foreclose Grinnell's competitors from the ITT market for sprinkler systems.

While this is a new claim asserted by the government for the first time at trial and was not among its claims at the preliminary injunction hearing, 306 F.Supp.

at 777–86, the legal basis for the claim is not open to question, having been clearly enunciated in Brown Shoe Co. v. United States, 370 U.S. 294, 323–24 (1962).

By common definition, a vertical merger is the acquisition of one company which buys the product sold by the acquiring company or which sells the product bought by the acquiring company. The government's vertical foreclosure claim here is based on the second clause of the foregoing definition.

■ The short and conclusive answer to the government's vertical foreclosure claim is that ITT's purchases of sprinklers represents a *de minimis* part of the market. While the government points out that 55 sprinkler systems were installed in ITT facilities during the past five years [135] and that ITT contemplates installing approximately 22 new sprinkler systems during the next year,[136] the stark fact is that ITT's planned expenditures in amount of $731,635 for sprinkler systems during the 1970–1972 period [137] represents less than 1/10 of 1% of the total prospective sprinkler system business for those years.[138] When, as here, the size of the market share foreclosed to competition as the result of the vertical integration aspects of a merger is *de minimis*, there can be no Section 7 violation because in such a situation competition cannot be said to have been substantially lessened. Brown Shoe Co. v. United States, *supra*, at 329.

Furthermore, the uncontroverted evidence shows that since ITT's acquisition of Grinnell the latter has been given no favoritism in the award of sprinkler business from other ITT subsidiaries, having lost as well as won such business.[139] The "profit center" concept [140]

---

130. *Infra*, p. 51.

131. Fee, Tr. 139–42. *Compare* McNamara, Tr. 1302–08, 1318–19.

132. Stevens, Tr. 516.

133. Groos, DT 10.

134. Meyer, Tr. 1560–61.

135. GX 256.

136. GX 257.

137. *Id.*

138. The domestic sprinkler market in 1969 exceeded $350,000,000. GX 370B. It is expected to expand rapidly in the future. Stevens, Tr. 516; Groos, DT 10.

139. Hills, Tr. 1615–16; Taylor, Tr. 1939–42; DX AS.

140. Woerthwein, DT 49–50; Haufler, DT 155–56; Laughlin, DT 17; Somers, Tr. 1464–65. *Compare* GX 241–43 *with* DX Y.

around which ITT is organized is not conducive to vertical foreclosure. The individual profit centers purchase on the basis of price, quality and delivery;[141] one profit center in attempting to sell to another must earn its way;[142] in purchasing products normally the subject of competitive bidding, such bidding is done without favoritism between profit centers, as well as with outside companies;[143] and in some instances it is more difficult for an ITT company to sell to another ITT company than to sell to an outsider.[144]

The Court holds that the government has not sustained its burden of establishing its vertical foreclosure claim.

## (F) CENTRAL STATIONS

The government also claims that the ITT–Grinnell merger will give Grinnell a competitive marketing advantage in that ITT will assist Grinnell in reentering the central station alarm business by giving it access to an ITT product known as "Digitor", and that such entry into the central station business in turn will give Grinnell substantial competitive advantages in the installation of automatic sprinkler systems.

The government's claim in this respect requires an analysis of the evidence upon the issues of (a) the alleged usefulness of Digitor in the central station business and (b) the relationship between central station business and the sale and installation of automatic sprinkler systems—all with a view to determining whether Grinnell will gain any substantial competitive advantages.

Digitor is an electronic system for monitoring alarm signals.[145] The person probably in the best position to evaluate its usefulness as a vehicle for entry into the central station business is Richard M. Garrett, the co-inventor of Digitor,[146] who testified as a government witness at the trial. Garrett formerly was employed by ITT, but not at the time of trial.[147] He testified that a number of other companies soon will have products serving the same function as Digitor which "will be equal or superior" to Digitor, and that "any large company deciding to develop a system now would have better, less expensive components at its disposal";[148] that Digitor is not the basic system he would like to use for central stations;[149] and that if he were going into the central station business he would not use Digitor.[150] Another central station witness called by the government testified that his company had studied Digitor and had found it to be "completely unacceptable".[151] And the senior vice president and manager of Grinnell's Fire Protection Division[152] testified that Grinnell does not plan to use Digitor in connection with any possible entry by Grinnell into the central station business because of its cost and certain technical problems it presents.[153]

Entirely apart from its affiliation with ITT, Grinnell has considered reentering the central station alarm business,[154] this being a field in which Grinnell had been engaged through certain subsidiaries (the largest being ADT) prior to divestiture of those subsidiaries pursu-

141. *Id.*

142. Geneen, DT 30; Will, Tr. 1859–60.

143. Morrow, DT 58–60A; Lowe, DT 27, 34–35. There have been instances in which the heads of particular profit centers urged their personnel to use other ITT companies. These situations occurred where the purchases were made by individual employees and where the purchasing performance of the profit center could not be affected. GX 222, 397. Such instances are rare and not uniform. Laughlin, DT 17.

144. Keller, DT 43–44.

145. GX 1, item 22.

146. Garrett, Tr. 719.

147. Garrett, Tr. 718–19.

148. Garrett, Tr. 765–67, 775.

149. *Id.*

150. *Id.*

151. Witteck, Tr. 1272–73.

152. *Hodges*, Tr. 2037.

153. *Hodges*, Tr. 2044–45, 2059.

154. *Hodges*, Tr. 2044; *Rison*, DT 64–65, 68–69.

ant to an antitrust decree.[155] In that case the government did not challenge the affiliation between Grinnell and its central station companies on the ground that it conferred any competitive advantage upon Grinnell with respect to its sprinkler sales.[156] And at the trial of the instant case witnesses called by both sides testified to the absence of any such advantage to Grinnell during the period of its ownership of ADT[157]—a period during which any advantage in sprinkler sales from affiliation with a central station company presumably would have manifested itself.

The evidence at the trial of the instant case, from witnesses with experience in the installation of sprinkler systems and central station equipment, established overwhelmingly that, even if ITT were to assist Grinnell in reentering the central station business, Grinnell would not thereby gain a significant competitive advantage in the sale and installation of automatic sprinkler systems.[158] Central station companies are not a significant source of leads for sprinkler companies. Most sprinkler witnesses testified they never had received a lead from a central station source.[159] Despite the suggestion of one witness that central station companies might hear about sprinkler work as a result of their periodic inspections of customers' properties,[160] this would not be the case with a company using Digitor,[161] for, as the government concedes in its brief, "[a]dmittedly, the 'Digitor', because of its advanced automated technology, cuts down on the number of personal contacts a central station company need have with its customers. . . ."[162]

Finally, the Court finds nothing in the record to explain why, if installation of central station equipment and automatic sprinklers at the same time were desirable, that could not be accomplished readily by sprinkler and central station companies coordinating their installation work without the necessity of affiliation between them.

The Court holds that the government has not sustained its burden of proving that the merger will give Grinnell an advantage in reentering the central station business or, assuming such reentry, that Grinnell thereby will gain an advantage in the sale and installation of sprinklers.

### (G) RECIPROCAL DEALING

The major marketing and promotional competitive advantage which the government claims Grinnell will gain from the ITT–Grinnell merger is an enhancement of Grinnell's market position through reciprocal dealing caused by ITT's large purchasing power. More particularly, the government asserts that the merger will give rise to "reciprocity", referring to a seller's practice of utilizing the volume or potential volume of its purchases to induce others to buy its goods or services;[163] and to "reciprocity effect", re-

155. United States v. Grinnell Corp., 384 U.S. 563 (1966).

156. *Id.*

157. Stevens, Tr. 524; Hauth, Tr. 1682; Fleming, DT 42; Rison, DT 69; Hodges, DT 97; White, DT 43; Meyer, Tr. 1558.

158. Lowery, Tr. 1493; Ford, Tr. 1585; Brown, Tr. 1702–03; Krumm, Tr. 1778; Aldridge, Tr. 1893–94; Taylor, Tr. 1947. *Compare* Dix, Tr. 1356–60.

159. Escue, Tr. 393; Larson, Tr. 583; McGilvray, Tr. 997; Lowery, Tr. 1493; Meyer, Tr. 1551–52; Brown, Tr. 1702; Raskin, Tr. 1748; Krumm, Tr. 1778; Aldridge, Tr. 1893; Taylor, Tr. 1946. *Compare* McIntire, DX AT *with* Moy-

nagh, Tr. 290–92. Also *compare* Taylor, Tr. 1947–49 and DX AL *with* Corley, DT 32–33.

160. Hauth, Tr. 1688–89. See also Witteck, Tr. 1269.

161. Garrett, Tr. 736–37.

162. Government's Post-Trial Brief, p. 73.

163. Witnesses at the trial came up with somewhat less sophisticated definitions of "reciprocity", *e.g.*, MacDonald, Tr. 405 ("You scratch my back and I'll scratch yours"); Chafin, Tr. 431 ("Someone doing a favor in return for a favor"); Stevens, Tr. 494 ("I buy from you. You buy from me").

ferring to the tendency of a company selling or desiring to sell to another company to channel its purchases to that company.

The legal basis for the government's claim of reciprocal dealing has been enunciated in such decisions as FTC v. Consolidated Foods Corp., 380 U.S. 592, 594 (1965); Allis-Chalmers Mfg. Co. v. White Consolidated Industries, Inc., 414 F.2d 506, 518–19 (3 Cir. 1969), cert. denied, 396 U.S. 1009 (1970); United States v. Ingersoll-Rand Co., 320 F.2d 509, 524 (3 Cir. 1963); United States v. General Dynamics Corp., 258 F.Supp. 36, 57–65 (S.D.N.Y.1966). But see United States v. Northwest Industries, Inc., 301 F.Supp. 1066, 1088–92 (N.D.Ill. 1969); United States v. Penick & Ford, Ltd., 242 F.Supp. 518, 521 (D.N.J.1965). And see also this Court's analysis of these decisions in its preliminary injunction opinion in the instant case. 306 F. Supp. at 783–86.

There are two essential factual requisites of the government's reciprocal dealing claim, in the light of which the evidence must be analyzed. First, whether the merger will create an opportunity for reciprocal dealing through a market structure conducive to such dealing. Second, whether such reciprocal dealing in fact is likely to occur, even if the merger were to create an opportunity for it. The Court turns directly to an analysis of the evidence to determine whether these essential requisites have been established.

It is common ground that the question of whether a merger will create a market structure conducive to reciprocal dealing is exceedingly complex. The answer depends upon a careful analysis of many variables. Among the factors believed to be relevant to the merger here under consideration are the extent to which ITT suppliers are actual or potential purchasers of sprinklers; whether sprinklers have product characteristics which lend themselves to reciprocal dealing; the scope of the market, represented by ITT, for products sold by ITT suppliers; the size and diversification of other companies to which ITT suppliers sell their products; and the degree to which the markets within which ITT suppliers operate are competitively structured. Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1387–88 (1965); Brodley, Oligopoly Power Under the Sherman and Clayton Acts, 19 Stan.L.Rev. 285, 327 (1967). With the exception of the first two factors mentioned, there is little or no evidence in the present record; and with respect to the remaining critical factors the Court is unable to make appropriate findings one way or the other —a situation specifically referred to in the Court's preliminary injunction opinion in the instant case. 306 F.Supp. at 782.

There is no dispute that ITT is a substantial purchaser of goods and services from numerous domestic suppliers, including some of the nation's leading industrial concerns. The government's evidence shows that ITT purchased in excess of $840,000,000 of goods and services in 1968; [164] and that it made purchases in excess of $100,000 from industries which accounted for 71% of total new plant and equipment expenditures by manufacturing industries in 1966.[165] Defendant's evidence shows, however, that in most of the industries just referred to ITT actually purchased from only a small fraction of the companies in the industry.[166] The government's evidence itself indicates that ITT's purchases represent but an infinitesimal percentage of the sales of its suppliers.[167]

In view of the Court's observations above regarding the paucity of evidence with respect to certain factors critical to a determination of whether the merger will create a market structure conducive to reciprocal dealing, it should be noted that there is no evidence from which the Court may determine the percentage of new plant and equipment ex-

---

164. GX 183.

165. GX 188.

166. DX KK.

167. GX 187.

penditures made by companies from which ITT in fact purchases. And yet it is abundantly clear, and the Court finds, that the *number of companies from which ITT in fact purchases* is a more reliable measure of the maximum reciprocity and reciprocity effect potential of the ITT–Grinnell merger than the total *number of companies in those industries from which ITT purchases*. This is especially so in view of the absence of any evidence whatever of alleged reciprocity in the sprinkler industry involving a merely *potential* as opposed to an *actual* supplier in the sprinkler industry.

Indeed, the Court is persuaded by a preponderance of the evidence that reciprocity and reciprocity effect are not significant factors in the sprinkler installation industry. The government's witnesses, representing substantial experience in the sprinkler business, with few exceptions [168] testified to no instances of actual or suspected reciprocity involving their companies or any other companies.[169] And other witnesses with long experience in the sprinkler industry, including present and former employees of Grinnell, testified in convincing fashion that they had never encountered a single instance of actual or suspected reciprocity.[170] The Court attributes considerable weight to this evidence in view of the thousands of sprinkler contracts per year entered into by Grinnell [171] which has approximately 20% of the national sprinkler installation market.[172]

From the standpoint of the market structure of the sprinkler industry, there are significant factors which militate against reciprocity practices. A substantial and increasing proportion of sprinkler work is done for non-industrial customers—such as educational institutions, hospitals and retail establishments —which are not actual or potential ITT suppliers.[173] Most sprinkler work, for all classes of customers, is awarded on a competitive bidding basis, thus minimizing reciprocity and reciprocity effect potential.[174] While it is true that, even with competitive bidding, favoritism may be shown by giving one bidder an opportunity to match the lowest bid, this

---

168. The Court has taken into account those alleged instances of reciprocity to which some witnesses testified. Some were trivial in scope, in some instances involving "leads" rather than actual sprinkler work. Carden, Tr. 326–27, 355–60; Coleman, Tr. 210–11; MacDonald, Tr. 405–17; Chafin, Tr. 432; Stevens, Tr. 504–05; Dahn, Tr. 705–06; Smith, Tr. 821–23; Ellington, Tr. 854–56; Peil, Tr. 1060–61. Others occurred long ago and, even as to them, substantial doubt is raised by controverting evidence. *Compare* Coleman, Tr. 210–11 *with* DX Q; Carden, Tr. 326–27, 355–59 *with* DX V *and* Tr. 2121–22; MacDonald, Tr. 411 *with* DX R; Stevens, Tr. 504–05 *with* DX W; Smith, Tr. 821–23 *with* Somers, Tr. 1463–64, 1487 *and* Brown, Tr. 1699.

169. Moynagh, Tr. 239 et seq. (all his life); Escue, Tr. 370 et seq. (14 years); Larson, Tr. 536 et seq. (24 years); Hinds, Tr. 589 et seq. (40 years); Sweitzer, Tr. 877 et seq. (24 years); Connelly, Tr. 923 et seq. (10 years); McGilvray, Tr. 956 et seq. (4 years); Curran, Tr. 1001 et seq. (28 years); Callison, Tr. 1023 et seq. (15 years).

170. Lowery, Tr. 1501 (19 years); Ford, Tr. 1590–91 (8 years); Hills, Tr. 1611 (5 years); Hauth, Tr. 1669 (41 years); Brown, Tr. 1708 (25 years); Krumm, Tr. 1783 (22 years); Port, Tr. 1795 (39 years); Aldridge, Tr. 1890 (16 years); Taylor, Tr. 1943–44 (20 years); White, DT 24–25 (more than 8 years).

171. See, *e.g.*, GX 375, 383 (one year's contracts from two of Grinnell's offices).

172. *Supra* note 35.

173. Meyer, Tr. 1563–64; Hauth, Tr. 1671; Carden, Tr. 310.

174. Coleman, Tr. 219–20 (85% of sprinkler work is competitively bid); Carden, Tr. 325 (94%–95%); Escue, Tr. 377 (95%); Dahn, Tr. 707 (nearly 100%); Glanz, DT 51–52 (90%); Corley, DT 38 (85%–90%); Colquitt, DT 14 (98%); Crawford, DT 25–26 (95%); Lowery, Tr. 1490 (about totally); Meyer, Tr. 1563 (more than 85%); Ford, Tr. 1580 (75%–90%); Hills, Tr. 1609 (almost all); Hauth, Tr. 1672 (great majority); Raskin, Tr. 1730 (95%–100%); Krumm, Tr. 1777 (99.9%); Port, Tr. 1795 (98%); Taylor, Tr. 1943 (85%).

practice is contrary to the ethical standards of general contractors;[175] and it is self-defeating in that it has the undesirable effect of discouraging others from bidding in the future.[176] Finally, a large proportion of sprinkler work is done in connection with new construction where sprinkler installers bid largely to general and mechanical contractors rather than to owners, thus minimizing the likelihood of significant ITT purchases from industrial sources.[177]

The effectiveness of the market structure inhibitions against reciprocity in the sprinkler industry appears to be confirmed by looking at Grinnell prior to its acquisition by ITT, during which period Grinnell had no established policy against reciprocity in the sale of automatic sprinkler systems.[178] Despite some occasional deviations which were not successful,[179] the record shows that reciprocity was not a significant factor in Grinnell's sprinkler business before the merger.[180] The managers of two Grinnell field installation offices, whose depositions were taken by the government, testified that they never encountered reciprocity in any form.[181] Other former long-time employees of Grinnell testified that they had no knowledge of the practice.[182]

The evidence upon which the government relies to show reciprocity in the sprinkler industry relates for the most part to a period of time more than five years ago[183] and involves alleged reciprocity between Grinnell and certain steel companies.[184] As to the latter, five of the companies which allegedly had reciprocity interest in Grinnell and, in one case, in an ITT subsidiary,[185] have entered into antireciprocity consent decrees designed to assure against future reciprocity or reciprocity effect in their business conduct.[186] Moreover, as indicated below,[187] the consensus of those in the best position to know is that the focus upon the illegality of reciprocity practices in recent years has brought about a substantial decline in the incidence of such practices—a trend which the record in the instant case indicates is more likely to continue than to abate.

Despite Grinnell's substantial purchasing power prior to its merger with ITT, the Court finds that Grinnell did not receive any significant reciprocity favoritism from purchasers of sprinkler systems. The government, in response to an interrogatory propounded by defendant during the course of pre-trial discovery proceedings, specified seven instances upon which it relies in support of its claim that Grinnell, as the result of reciprocity, received sprinkler business it would not otherwise have received.[188] These seven instances may be summa-

175. Moynagh, Tr. 284; Ramsey, Tr. 1924–27.

176. Lowery, Tr. 1504–05; Meyer, Tr. 1564–65; Ford, Tr. 1591–92; Brown, Tr. 1708–09; Krumm, Tr. 1784–85; Aldridge, Tr. 1890–91.

177. *E.g.*, Moynagh, Tr. 265 (90% of sprinkler work is bid to general and mechanical contractors rather than to owners); Lowery, Tr. 1491 (80%); Brown, Tr. 1700 (70%); Crook, DT 8–9 (75%); Harms, DT 10 (60%–80%); Colquitt, DT 11 (75%–80%). See also Chafin, Tr. 446.

178. Hodges, Tr. 2059; Lawton, DT 2–75 to 2–76; Rison, DT 12.

179. Hodges, Tr. 2059.

180. Many of the government's so-called "reciprocity" exhibits regarding Grinnell show on their face that they do not relate to its sprinkler business. GX 27, 39, 45–49 (see DX K), 51, 52, 55–64, 72, 75, 77, 79–83, 90–95, 98, 105, 117–19. Other such government exhibits do not appear to have anything to do with Grinnell's sprinkler business. GX 43, 44, 50, 65–71, 73, 74, 76, 78, 86, 88, 89, 96, 97, 100–04, 106–12, 116A–B.

181. Taylor, Tr. 1943–44; White, DT 24–25.

182. Lowery, Tr. 1501; Brown, Tr. 1699, 1708; Krumm, Tr. 1783.

183. GX 16–18, 27–29, 39–40, 42–71, 84–86, 98 (not dated), 99–103, 113–15, 117.

184. GX 43 through GX 115.

185. GX 168–79.

186. DX EE, FF, GG, HH and II.

187. *Infra* note 212.

188. DX H.

rized as follows: in two instances, Grinnell received no favoritism at all, although attempts were made to convince Grinnell to the contrary;[189] in a third, Grinnell received no favoritism but merely a fair opportunity to compete;[190] in a fourth, Grinnell was the low bidder but with no indication of a special opportunity to rebid;[191] in a fifth, no sprinkler work was involved (and it has been so stipulated);[192] in a sixth, Grinnell received no work at all;[193] and in the seventh, there not only was no evidence that Grinnell received any favoritism but there was no evidence that it received a sprinkler job at all.[194] Other evidence adduced by the government indicated that Grinnell thought it had been favored because of reciprocity, whereas in fact it had not,[195] or that the reciprocity discussion failed to materialize in sprinkler work.[196]

Turning from the sprinkler industry and from Grinnell, the Court now directs its attention to the other party to the merger, ITT, to ascertain whether the evidence demonstrates that reciprocal dealing in fact is likely to occur. There are several aspects of ITT's organization and practices which are directly relevant. First, ITT is organized into a series of "profit centers", each managed and staffed by personnel whose business careers, advancement, financial rewards and reputations depend upon the success of the specific profit center with which the men are identified, rather than upon the performance of ITT as a whole.[197] These profit centers on occasion cooperate with one another,[198] as unrelated companies would cooperate;[199] but they do so only when it is in their mutual interest to do so.[200] The management of one profit center has no motivation to tailor its purchasing decisions to facilitate the sales of another profit center.[201] In selecting suppliers, the purchasing officer of each profit center deals with such variables as price, reliability of delivery, quality, willingness of suppliers to meet product emergencies, and the ability of suppliers to supply cost saving ideas; the imposition of reciprocity considerations in the purchasing of supplies, in addition to these variables, would strip the profit center of its essential purpose, namely, to show the maximum profit.[202]

Second, ITT does not collect purchasing and sales data necessary to identify reciprocal purchasing opportunities. ITT in the regular course of its business makes no overall compilation of its purchases by suppliers; nor is there any communication between ITT's headquarters marketing and purchasing departments, nor between ITT's different profit centers, such as to identify suppliers.[203] The only two compilations of purchasers made by ITT during the past ten years have been made at the specific request of the government (plaintiff herein).[204] Absent such compilations of purchases and communications between profit centers regarding purchases, ITT sim-

189. *Compare* GX 32 and 41 *with* DX A and B.

190. *Compare* GX 35 *with* Ramsey, Tr. 1916, 1922, 1931.

191. GX 38.

192. *Compare* GX 48 and 49 *with* DX K.

193. *Compare* GX 36 and 37 *with* DX K.

194. GX 84.

195. *Compare* GX 28–33 *with* DX A, L, N, O, P, S.

196. *Compare* Lawton, DT 2–39 through 2–41 *with* GX 16–26; DX K *with* GX 40 and 42. See also GX 113–15.

197. DX F, Attachment A, pp. 361–64; Geneen, DT 76.

198. Haufler, DT 90; Lowe, DT 32; Morrow, DT 16–20; Patton, DT 61–62; GX 1, item 2; GX 191–211.

199. Haufler, DT 90; Lowe, DT 32; Morrow, DT 16–17, 20–21.

200. Haufler, DT 90; Morrow, DT 18–19; Patton, DT 61–62; Woerthwein, DT 103.

201. DX F, Attachment A, pp. 361–64, 366–67; Geneen, DT 76–77.

202. DX F, Attachment A, pp. 366–70, 373–74.

203. Keller, DT 16; Patton, DT 8; Eddy, DT 9, 22.

204. DX F, Attachment A, p. 372; Patton, DT 15.

ply is in no position to respond to any supplier or potential supplier who may have purchased Grinnell sprinklers in the hope of selling goods or services to some other ITT profit center.[205]

Third, ITT has had a written policy against the practice of reciprocity since 1966.[206] This policy has been widely disseminated among ITT's purchasing and sales personnel on a continuing basis.[207] Witnesses with extensive ITT experience testified that they never have encountered any instance of reciprocity or reciprocity effect.[208] And the government has adduced no evidence that any ITT unit has ever obtained business as a result of reciprocity or reciprocity effect.[209]

In view of the foregoing, it is understandable that considerations of prospective reciprocity opportunities played no part in bringing about the ITT-Grinnell merger.[210]

In short, the Court finds that the substantial, credible evidence demonstrates that reciprocity and reciprocity effect is not likely to occur, even if the merger were to create the opportunity for reciprocal dealing, particularly in view of ITT's antireciprocity policy, implemented by the withholding of purchasing and sales data and the profit center organization of ITT. Even if ITT suppliers on their own initiative were to purchase sprinkler systems from Grinnell without pressure from ITT in an effort to gain favor with ITT and to obtain reciprocal sales, such suppliers would find that their purchases would not have the desired effect—as the record here makes abundantly clear.

Returning to the decisions [211] relied on by the government in support of its reciprocal dealing claim and without repeating this Court's analysis of those decisions in its preliminary injunction opinion, 306 F.Supp. at 783–86, it is pertinent to note that the record now before the Court is a vastly more comprehensive one than at the time of the preliminary injunction hearing. See Allis-Chalmers Mfg. Co. v. White Consolidated Industries, Inc., *supra*, at 527; United States v. Ingersoll-Rand Co., *supra*, at 523. Since the preliminary injunction hear-

---

205. DX F, Attachment A, pp. 384–86; Geneen, DT 74.

206. DX JJ.

207. Aibel, Tr. 1624–27.

208. Haufler, DT 154–55; Keller, DT 69–69A; Lowe, DT 17; Morrow, DT 56–57; Woerthwein, DT 40–43; Patton, DT 41–44, 53–57.

209. In view of the size of the ITT organization reflected by its large number of subsidiaries and its many employees, the isolated instances of alleged reciprocity relied upon by the government strike the Court as exceptions which again prove the rule that ITT has had no substantial or significant reciprocal dealing practices.

For example, the government points to certain proposed barter transactions arising out of unusual circumstances that appear to have no bearing upon any assistance that Grinnell might receive as a result of its affiliation with ITT. GX 130–33; Geneen, DT 64–66; GX 135–38; Morton, Tr. 1877–78. The government also relies upon certain correspondence which did not produce a meeting of the minds or any commercial relationship, and which involved a unique business situation resulting in major litigation between the parties to the correspondence. GX 123, 124; Aibel, Tr. 1630–43.

The closest the government has come to showing that certain individuals of an ITT company were attempting to practice reciprocity involved incidents which occurred shortly after ITT acquired that company and as to which there was no evidence that such attempts were successful. GX 139–49; Aibel, Tr. 1628–30; GX 168, p. 2 (the author of GX 168 was not an ITT employee). Those involved in one of these attempts, and the target of the other, were concerned solely with purchases from and sales to the particular ITT unit. GX 139–49; GX 170–79. Such evidence, aside from its isolated character, at most would not demonstrate that Grinnell's sprinkler market position would be enhanced by Grinnell's affiliation with ITT; for such evidence does not show that purchases of ITT units other than Grinnell would play any part in Grinnell's ability to sell sprinklers.

210. Luke, DT 14, 17, 19; Rison, DT 28–29.

211. *Supra*, p. 42.

ing, counsel and their investigators have had almost a full year of opportunity for extensive discovery. To the knowledge of the undersigned trial judge, that opportunity has been utilized by leaving no stone unturned in combing the files of the parties to the merger as well as the files of third parties; and in contacting directly hundreds of present and past personnel of ITT, Grinnell and other companies.

Upon the entire record, the Court holds that the government has not sustained its burden of establishing either that the merger will create an opportunity for reciprocal dealing through a market structure conducive to such dealing, or that reciprocal dealing in fact is likely to occur even if the merger were to create an opportunity for it.[212]

## SUMMARY UNDER THIS SECTION

The Court, assuming that Grinnell is a dominant competitor in the automatic sprinkler devices and automatic sprinkler systems markets (despite the Court's holding above to the contrary),[213] concludes that Grinnell will not gain marketing and promotional competitive advantages from the merger in any of the following specific respects claimed by the government: package or system selling; affiliation with Hartford; access to ITT's financial resources and advertising; foreign expansion; vertical foreclosure; central stations; or reciprocal dealing.

The Court's conclusion in this respect is based upon the effects of the alleged marketing and promotional competitive advantages considered separately and cumulatively; neither separately nor cu-

---

212. While of course not binding on the parties or this Court, certain recent statements by present and former Assistant Attorneys General In Charge of the Antitrust Division are revealing in the perspective in which they place the reciprocity trend in the American business community.

Hon. Richard W. McLaren, the present head of the Antitrust Division, in commenting on the government's publicity against reciprocity practitioners and upon communications reflecting this program mailed to tens of thousands of business firms pursuant to consent decrees, has stated:

" . . . [O]ur contacts with the Bar, with the business press, and others, lead us to believe that this effort has already left its mark. Firms that engaged in systematic reciprocity more or less in self-defense have tended to abandon it, and we have strengthened the hands of lawyers who have tried but heretofore have been unable to convince their clients that reciprocity was not only illegal but was likely to draw the government's fire. *I regard this program as being well on its way to success.*" (Reported in BNA Antitrust and Trade Regulation Report No. 447, p. X–13 (February 3, 1970)) (Emphasis added)

Hon. Donald F. Turner, the immediate past head of the Antitrust Division, in commenting on the potential for reciprocity in calculating the consequences of a conglomerate merger, has stated:

"I have come to believe that the potentiality of reciprocity deserves to be all but disregarded in calculating the likely consequences of a conglomerate merger. I shall assume, although there are others who earnestly suggest otherwise, that reciprocity is invariably a bad thing. I would disregard it in the merger area not because it may be neutral or beneficial in some circumstances, but rather because invidious reciprocity can be largely eradicated by a direct approach under existing law, an approach which has already been taken by the enforcement authorities and which I am quite confident the courts will uphold." (Statement of Donald F. Turner before the House Subcommittee on Antitrust and Monopoly, p. 10 (February 5, 1970)).

See also the recent speech by Hon. Lee Loevinger, former head of the Antitrust Division, reported in BNA Antitrust and Trade Regulation Report No. 480, pp. A–8, 9 (September 22, 1970); Report of President Nixon's Task Force on Productivity and Competition, BNA Antitrust and Trade Regulation Report No. 413, p. X–6 (June 10, 1969) (concludes that reciprocity is not currently a significant problem); Keeshan, Conglomerate Mergers and the Theory of Reciprocity, 22 Stan.L.Rev. 812 (1970).

213. *Supra*, pp. 26–29.

mulatively will they result in a substantial lessening of competition. *Cf.* United States v. Wilson Sporting Goods Co., 288 F.Supp. 543, 563 (N.D.Ill.1968).

## III

### CLAIM REGARDING POWER PIPING

■ Although the Court has held that Grinnell is not the dominant competitor in the power piping industry,[214] it nevertheless will rule upon the government's claims that the ITT-Grinnell merger will confer marketing and promotional competitive advantages upon Grinnell in the power piping market, chiefly in the following respects: package or system selling; access to ITT's financial resources; foreign expansion; and reciprocal dealing.[215]

Preliminarily, it should be noted that the fact that Grinnell, as in the case of four of its competitors,[216] is an integrated company in the sense that it both fabricates and erects power piping systems does not confer a unique advantage. The evidence shows that when it is necessary to submit a single fabrication-erection bid, fabricators are able to enter into joint ventures or subcontracting arrangements with erecting companies and thus participate in the bidding.[217]

Nor does Grinnell have a significant competitive advantage in the fabrication-erection power piping market by virtue of its ability, along with two of its competitors,[218] to manufacture power pipe hangers which are used to fasten power piping systems to their physical supports.[219] Such hangers cost about 10% of a fabricated system and less than 5% of an installed system.[220] Fabricators who do not manufacture hangers obtain them from manufacturers on the basis of bids.[221] Two of the largest fabricator-erector companies in terms of volume of power piping systems have chosen not to manufacture hangers themselves, believing such to be uneconomic and unnecessary.[222]

With respect to the government's package or system selling claim, the record is barren of any evidence that power piping can be packaged or sold together with products manufactured by ITT. Substantially all solicitations for power piping bids are limited to the piping component of such systems.[223] When specifications call for additional items, such items are incidental in value and function to the primary system; and there is no basis for finding that a power piping bidder would have any significant advantage in being affiliated with the manufacturer of such items.[224] Many of the Court's findings made in connection with the government's packaging claim regarding automatic sprinkler devices and systems [225] are likewise applicable here—including the lack of any evidence to support the government's claim that ITT as a mechanical contractor will engage in the installation of plumbing, heating and air conditioning equipment, or will make it possible for Grinnell to do so; [226] and the evidence that prior to the merger Grinnell had sold hundreds of products

---

214. *Supra*, pp. 26–27.

215. At the preliminary injunction hearing the government withdrew its claim that the merger would cause a lessening of competition in the power piping market. 306 F.Supp. at 771 n. 3. And at the conclusion of the trial on the merits, government counsel informed the Court that his chief concern was not directed at the power piping market. (Widmar, Tr. 2180).

216. Carry, DT 12; McCully, DT 11; Schwab, DT 12–13; Patterson, DT 20.

217. Pease, DT 64–65; Schwab, DT 10–11.

218. Pease, DT 88; McCully, DT 14.

219. Pease, DT 90–91.

220. Carry, DT 17–18.

221. Schwab, DT 16–17; McCully, DT 14; Carry, DT 18–19; Patterson, DT 27–29.

222. Carry, DT 19; McCully, DT 15.

223. Pease, DT 100; Carry, DT 65; McCully, DT 20.

224. Pease, DT 100–01.

225. *Supra*, pp. 30–33.

226. *Supra*, pp. 31–32.

to the construction industry without packaging them with sprinklers.[227]

Despite some rather strong language [228] in support of the government's claim that access to ITT's financial resources will give Grinnell a competitive advantage in the power piping market, the evidence simply does not bear this out. As with the government's similar claim in the sprinkler market,[229] an appropriate inquiry here is whether Grinnell *needs* ITT's financial resources in the power piping business. There is no evidence whatever that Grinnell, with concededly very substantial financial resources aside from ITT, has ever been impeded in the power piping field for lack of funds; nor is there any evidence that additional financial resources would increase its competitive strength in the power piping market. A number of power piping witnesses who testified to a general dislike of the ITT-Grinnell merger were unable to specify how it would adversely affect their companies and some said they could foresee no impact at all.[230]

The government also claims, as it did with respect to the sprinkler market,[231] that ITT's foreign operations and influence will aid Grinnell's sale of power piping abroad, thus effectively foreclosing Grinnell's competitors from expanding into the overseas market, as well as stifling domestic competition. The evidence is overwhelmingly to the contrary. Essentially, the evidence shows that there is no significant foreign market for power piping fabricated in the United States and there are sound reasons for

believing this will continue to be so.[232] There are enough power pipe fabricators and erectors in Europe and in Japan to supply those foreign markets; and these foreign companies enjoy labor and material costs substantially below those of United States companies.[233] The only evidence of power piping exports to American companies involved construction projects financed under United States foreign aid programs where the American companies were required to buy American power piping systems.[234] Such exports are an insignificant percentage of the total fabrication sales of the companies making them.[235] And since such sales actually are made in the United States to United States companies,[236] they appropriately may be viewed as domestic sales so far as competitive factors are involved.

Finally, the government's claim that Grinnell will gain a competitive marketing advantage from the merger because the power piping industry is susceptible to reciprocity and reciprocity effect finds no support whatever in the evidentiary record and indeed is insufficient as a matter of law.

Concededly the record contains no industry statistics or other data by which any company's share of the power piping market can be ascertained.[237] There is even less basis in the record in connection with power piping, than there was in connection with the government's reciprocal dealing claim in the sprinkler market,[238] for examining those factors critical to a determination of the complex question of whether the merger will cre-

---

227. *Supra*, p. 32.

228. In the addendum to its post-trial brief (p. 4), the government states: "Perhaps in no other phase of Grinnell's operations are finances as important as in power piping."

229. *Supra*, pp. 37–38.

230. Carry, DT 23–25; McCully, DT 19; Patterson, DT 72.

231. *Supra*, pp. 38–39.

232. Pease, DT 96–98; Carry, DT 21; McCully, DT 15.

233. Pease, DT 98; Carry, DT 21; McCully, DT 15; Schwab, DT 20–21.

234. Pease, DT 96–97; Carry, DT 21, 50–51; McCully, DT 15–16; Schwab, DT 20; Patterson, DT 23.

235. Pease, DT 96–97; Carry, DT 21, 24; McCully, DT 18; Schwab, DT 20; Patterson, DT 33–34.

236. McCully, DT 18, 41–42; Patterson, DT 34.

237. *Supra*, pp. 26–27.

238. *Supra*, pp. 41–47.

ate a market structure conducive to reciprocal dealing.[239]

Such evidence as there is strongly indicates that the structure of the power piping market is not conducive to reciprocity. Ultimate purchasers of most large power piping systems are public utilities which have legal monopolies in the geographic areas in which they operate.[240] Most contracts actually are let by consulting engineers and general contracting firms.[241] Power piping work almost invariably is awarded on the basis of competitive bids.[242] No power piping witness was able to point to a single instance in recent years where a job had been awarded for reasons of reciprocity.[243] Nor was any power piping witness able to identify any job where bidders had been permitted to revise their original bids once submitted, absent specification changes.[244] While a number of companies in the power piping industry are large and have substantial purchasing power,[245] the witnesses who impressed the Court as being the most experienced in the industry and whose testimony is entitled to great weight made it crystal clear that the power piping market affords no substantial opportunity for reciprocity or reciprocity effect.[246]

The Court holds that the government has not sustained its burden of establishing that in the power piping market the merger may have the effect of substantially lessening competition by giving Grinnell marketing and promotional competitive advantages in the respects claimed, namely, package or system selling, access to ITT's financial resources, foreign expansion or reciprocal dealing—whether viewed separately or cumulatively.

## IV

## CLAIM REGARDING PIPE HANGERS

■ The government's position with respect to the alleged anticompetitive effects of the merger in the pipe hanger market is simple and direct, requiring little discussion. The government's claim in short is that, since pipe hangers are necessary components of automatic sprinkler systems and power piping systems, Grinnell, by gaining anticompetitive advantages in the installation of sprinkler systems and in the power piping market, will also gain similar advantages in the sale of pipe hangers.[247]

The Court has held that Grinnell is not the dominant competitor in the pipe hanger industry.[248] And, as with the power piping market,[249] concededly the record contains no market or industry statistics by which any company's share of the pipe hanger market can be de-

239. *Supra*, p. 42.

240. Pease, DT 82; McCully, DT 8; Schwab, DT 7–8.

241. Pease, DT 25, 28–29, 51–52; Prebor, DT 6–7.

242. Pease, DT 51–52; Carry, DT 11–12, 30–32; McCully, DT 9–10, 21–22, 33; Schwab, DT 19; Prebor, DT 6–7, 19.

243. Pease, DT 81; Carry, DT 25.

244. Pease, DT 59–61; Carry, DT 28–29, 70–71; McCully, DT 10, 35.

245. McCully, DT 3–4; Schwab, DT 3; Prebor, DT 68.

246. Carry, DT 25; McCully, DT 21–22.

247. Widmar, Tr. 2178–79.
While the government in its complaint appears to have treated separately the product markets of *pipe hangers* (components of automatic sprinkler systems) and *power pipe hangers* (used in power piping systems), see note 13, *supra*, and the Court treated them as separate product markets in its preliminary injunction opinion, 306 F.Supp. at 771–72 and 771 n. 3, the government's addendum to its post-trial brief treats pipe hangers in the automatic sprinkler and power piping industries as a single product line. *Compare* Widmar, Tr. 2178–79.
In any event, the Court's findings in this section of its opinion apply to all pipe hangers—those used in automatic sprinkler systems, as well as in power piping systems.

248. *Supra*, p. 27.

249. *Supra*, pp. 26–27, 49.

termined accurately.[250] While there is no evidence as to the number or value of pipe hangers used in connection with sprinkler systems or power piping systems, the record does indicate that hangers represent a very small proportion of the value of such systems.[251]

The Court holds that the government has not sustained its burden of establishing that the merger may have the effect of substantially lessening competition in the pipe hanger market.[252]

## V

### CREDIBILITY OF WITNESSES

While some of the evidence has been stipulated or is undisputed and much of it is documentary, on almost every critical issue in this case—to a substantially greater degree than in most antitrust cases—it has been necessary for the Court to resolve questions of credibility and to determine the appropriate weight to be given to testimony of the trial witnesses called by both sides. This has been done on the basis of specific notations of the undersigned trial judge in his trial notes made contemporaneously with the testimony of each witness.

The testimony of each of the 53 witnesses who testified during the 18 day trial has been carefully evaluated in accordance with the following tests which this Court over a period of more than a decade on the trial bench has found to be helpful and reliable in performing its fact finding responsibility of resolving credibility and of determining weight:

> "The Court, in weighing their testimony, applied such recognized tests as: their demeanor while on the stand; any interest they might have in the

outcome of the case; any bias or prejudice for or against either party; their opportunity to observe; any reason to remember or forget; the inherent probability of their testimony; its consistency or lack of consistency; and its corroboration or lack of corroboration with other credible evidence. The testimony of the witnesses, moreover, has been weighed in the light of—and indeed has cast light upon—the exhibits. . . ." Locke Manufacturing Companies v. United States, 237 F.Supp. 80, 89 (D.Conn. 1964).

See also Heyman v. Kline (D.Conn. 1970); McNellis v. Raymond, 287 F. Supp. 232, 241 (N.D.N.Y.1968), aff'd in part, rev'd in part, 420 F.2d 51 (2 Cir. 1970); United States v. Capaldo, 276 F.Supp. 986, 992–93 (D.Conn.1967), aff'd, 402 F.2d 821, (2 Cir. 1968), cert. denied, 394 U.S. 989 (1969); Lomartira v. American Automobile Insurance Company, 245 F.Supp. 124, 131 (D.Conn. 1965), aff'd, 371 F.2d 550 (2 Cir. 1967); Segan Construction Corp. v. Nor-West Builders, Inc., 274 F.Supp. 691, 696 (D. Conn.1967); Rosner v. Modern Maid Packers, Inc., 274 F.Supp. 685, 689 (D.Conn.1967); Westchester Fire Insurance Company v. Tantalo, 273 F.Supp. 7, 15–16 (D.Conn.1967); United States v. Feudale, 271 F.Supp. 115, 119 (D.Conn. 1967); Pickett v. Nelseco Navigation Company, 270 F.Supp. 682, 683 (D.Conn. 1967).

## VI

### CLAIM OF ECONOMIC CONCENTRATION

At the preliminary injunction hearing in this case the government raised, and

---

250. *Supra,* p. 27.

251. Groos, DT 12–13.

252. Of course, this result follows wholly aside from the Court's independent consideration of such evidence as has been introduced bearing upon the alleged anticompetitive effects of the merger upon the pipe hanger market. By failing to establish the likelihood of a substantial lessening of competition in the automatic sprinkler and power piping markets, upon the government's own representations it necessarily has failed to sustain its burden with respect to the pipe hanger market.

The converse, however, would not necessarily follow had the Court held that the merger might lessen competition in the automatic sprinkler or power piping markets.

the Court ruled upon, a claim of economic concentration. 306 F.Supp. at 796–97. At the trial on the merits the government, through its offer of the proposed written testimony of Dr. Willard F. Mueller,[253] again raised the same issue but with a different and somewhat ingenious twist.

The new twist to the government's economic concentration claim is that in the wake of a "trend among large diversified industrial firms to acquire other large corporations", it can be established that "anticompetitive consequences will appear in numerous though *undesignated individual 'lines of commerce'*." [254] (Emphasis added)

The Court's short answer to this claim —and the ground for its ruling sustaining defendant's objection to the Mueller testimony for lack of relevance—is that the legislative history, the statute itself and the controlling decisional law all make it clear beyond a peradventure of a doubt that in a Section 7 case the alleged anticompetitive effects of a merger must be examined in the context of *specific product and geographic markets;* and the determination of such markets is a necessary predicate to a determination of whether there has been a substantial lessening of competition within an area of effective competition. To ask the Court to rule with respect to alleged anticompetitive consequences in *undesignated lines of commerce* is tantamount to asking the Court to engage in judicial legislation. This the Court most emphatically refuses to do. See 306 F.Supp. at 796–97.

Recognition of the trend toward economic concentration in American industry, including extensive conglomerate merger activity in recent years, is not exactly new.[255] The government points out [256] that the trend during the last two decades toward concentration of assets in the hands of fewer and larger corporate entities, together with an increasing diversification of those firms which primarily control the assets, has resulted in certain anticompetitive effects, among which are increased opportunities for business reciprocity and reciprocity effect, citing FTC v. Consolidated Foods Corp., 380 U.S. 592 (1965).[257] Then, re-

253. GX 423 (identification only).

Aside from defendant's various specific objections (Tr. 1406–24) to the form and content of Dr. Mueller's proposed testimony which the Court sustained (Tr. 2173–74), defendant also interposed a general objection (Tr. 1401–05; 2145–70) on the ground that the preferred testimony would be irrelevant to any issue in the case since it did not purport to relate to any "line of commerce", despite the government's claim that "trade carried on by large diversified corporations is, in fact, a line of commerce" (Tr. 1424). The Court sustained defendant's general objection of lack of relevance (Tr. 2173–75).

This section of the Court's opinion is directed to the reasons for the latter ruling.

254. "Plaintiff's Memorandum In Opposition To Motion To Strike Dr. Mueller's Testimony", filed October 28, 1970, p. 8 (hereinafter, "Government's Mueller Memorandum").

Since Dr. Mueller's testimony was never admitted in evidence, no motion to strike was before the Court. The government's memorandum accordingly was construed as a document in support of the government's claim of admissibility of the Mueller testimony (Tr. 2145; 2172).

255. This trend toward concentration is outlined in United States v. Northwest Industries Inc., 301 F.Supp. 1066, 1092–93 (N.D.Ill.1969). See also Hearing on Economic Concentration Before the Subcomm. on Antitrust and Monopoly of the Senate Comm. on the Judiciary, 88th Cong., 2d Sess., pt. 1, at 77–96, 119–29, 204–19 (1964); 89th Cong., 1st Sess., pt. 2, at 508–20 (1965); Davidow, Conglomerate Concentration and Section Seven: The Limitations of the Anti-Merger Act, 68 Colum.L.Rev. 1231, 1232–35 (1968). Not all commentators agree that such a concentration trend in the American economy has in fact occurred. See Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L. Rev. 1313, 1327 (1965). For purposes of this section of the opinion, the Court assumes that there has been a trend toward concentration.

256. Government's Mueller Memorandum, *supra* note 254, at 1–2.

257. Mr. Justice Stewart, in his concurring opinion in *Consolidated Foods*, stated:

"Clearly the opportunity for reciprocity is not alone enough to invalidate a merger under § 7. *The Clayton Act*

ferring to certain of the theories expressed in Professor Mueller's proposed testimony, the government contends that the most important anticompetitive effect of the trend toward conglomeration by merger is "conglomerate interdependence and forebearance", meaning "a system in which competitors respond to each other and to their own needs rather than to the impersonal disciplining forces of the market in general." [258] From this the government concludes that " '[t]rade engaged in by large diversified industrial firms' describes a combination of many 'lines of commerce'." [259]

The legislative history of the 1950 amendments to Section 7 of the Clayton Act, 64 Stat. 1125, reflects a concern on the part of Congress about the rising tide of economic concentration in American industry caused by all types of mergers, including conglomerate mergers. As the Supreme Court observed in its analysis of the legislative history [260] in Brown Shoe Co. v. United States, 370 U.S. 294, 315 (1962):

"... the dominant theme pervading congressional consideration of the 1950 amendments was a fear of what was considered to be a rising tide of economic concentration in the American economy."

But the legislative history also indicates that Section 7 as amended was not in-

tended to proscribe all mergers which result in economic concentration.[261] The House Report recommending passage of amended Section 7 concluded that:

"the purpose of the bill [H.R. 2734] is to protect competition *in each line of commerce* in each section of the country." [262] (Emphasis added)

Similarly, the Senate Report stated that:

"It is intended that acquisitions which substantially lessen competition, as well as those which tend to create a monopoly, will be unlawful *if they have the specified effect in any line of commerce,* whether or not that line of commerce is a large part of the business of any of the corporations involved in the acquisition." [263] (Emphasis added)

Amended Section 7 as enacted is specific in barring a merger only "where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition." [264]

Even if the legislative history and the amended statute on its face were not as clear as the Court believes, the decisional law uniformly has emphasized the importance of defining the specific product market or line of commerce in which alleged anticompetitive effects of a merger are to be measured.[265] In Brown Shoe

*was not passed to outlaw diversification.*" 380 U.S. at 603 (Emphasis added).

258. Government's Mueller Memorandum, *supra* note 254, at 2.

259. *Id.* at 10.

260. The House Report on the proposed amended Section 7 stated that "measured by practically any method and compared to practically any standard, the level of economic concentration in the American *economy is high.*" H.R.Rep.No.1191, 81st Cong., 1st Sess., 2 (1949).
The Senate Report stated that "the purpose of the proposed bill, H.R. 2734, is to limit future increases in the level of economic concentration resulting from corporate mergers and acquisitions." S.Rep.No.1775, 81st Cong., 2d Sess., 3 (1950).

261. Note, Conglomerates and Section 7: Is Size Enough?, 70 Colum.L.Rev. 337, 340 (1970).

262. H.R.Rep.No.1191, 81st Cong., 1st Sess., 8 (1949).

263. S.Rep.No.1775, 81st Cong., 2d Sess., 5 (1950).

264. 15 U.S.C. § 18 (1964).

265. See, *e.g.*, the market definitions in United States v. Von's Grocery, 384 U.S. 270, 272–274, 277 (1966); FTC v. Consolidated Foods Corp., 380 U.S. 592, 595 (1965); United States v. Continental Can Co., 378 U.S. 441, 447–58 (1964); United States v. Penn-Olin Co., 378 U.S. 158, 161–165 (1964); Brown Shoe Co. v. United States, 370 U.S. 294, 325–28 (1962).

Co. v. United States, *supra*, at 335, the Supreme Court held that:

"the proper definition of the market is a 'necessary predicate' to an examination of the competition that may be affected by the [horizontal] aspects of the merger." [266]

Despite the legislative history, the statute itself and the controlling decisional law, the government urges the Court to adopt an "expansive" reading of the statutory language "in any line of commerce" so as to read into the statute an interdiction of all mergers where the effect may be a substantial lessening of competition "anywhere, in the purchase or sale of anything" and thus to receive "proof of a merger or series of mergers which could be demonstrated to have a broad, anticompetitive effect upon 'markets' in general" [267]—in short, to disregard the statutory requirement that alleged anticompetitive effects of a merger be examined with relation to a specific "line of commerce" and instead to conduct a roving expedition to determine whether "anticompetitive consequences will appear in numerous though *undesignated individual 'lines of commerce.'* " [268] (Emphasis added)

In response to the Court's inquiry of government trial counsel as to "whether there is authority, legislative or judicial authority, to support that claimed line of commerce",[269] government counsel replied, "The Government unfortunately cannot point to a particular case where the Court held that this was a line of commerce." [270]

■ The Court declines the government's invitation to indulge in an expanded reading of the statutory language and holds that the statute means just what it says. It proscribes only those mergers the effect of which "may be substantially to lessen competition"; it commands that the alleged anticompetitive effects be examined in the context of specific product and geographic markets; and it does not proscribe those mergers the effect of which may be substantially to increase economic concentration. 306 F.Supp. at 796.

Whatever may be the merits of the arguments as a matter of social and economic policy in favor of, or opposed to, a standard for measuring the legality of a merger under the antitrust laws by the degree to which it may increase economic concentration rather than by the degree to which it may lessen competition, that is beyond the competence of the Court to adjudicate. As the Court attempted to make clear in its preliminary injunction opinion, 306 F.Supp. at 796–97, if that standard is to be changed, it is fundamental under our system of government that any decision to change the standard be made by the Congress and not by the courts.

---

266. See also United States v. E. I. du Pont De Nemours & Co., 353 U.S. 586, 593 (1957):

"[d]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition 'within the area of effective competition'. Substantiality can be determined only in terms of the market affected."

In *Brown Shoe*, the Supreme Court listed the salient characteristics of a market or line of commerce. 370 U.S. at 325. It should be noted that in the instant case, in response to defendant's interrogatories, the government stated that trade carried on by large diversified companies does not fall within those market characteristics. Tr. 2169; DX G.

267. Government's Mueller Memorandum, *supra* note 254, at 3.

268. Id. at 8.

269. Tr. 2163.

270. Tr. 2165.

## CONCLUSIONS

Upon the facts found and for the reasons stated above, the Court concludes as follows:

(1) That the Court has jurisdiction over the subject matter and the parties.

(2) That venue is properly laid in the District of Connecticut.

(3) That the government has not sustained its burden of establishing that Grinnell is the dominant competitor in any of the relevant product and geographic markets, i. e. in any line of commerce in any section of the country.

(4) That the government has not sustained its burden of establishing that ITT's acquisition of Grinnell may have the effect of substantially lessening competition.

(5) That the government is not entitled to a permanent injunction enjoining the said acquisition.

(6) That defendant is entitled to judgment dismissing the complaint on the merits.

(7) That the final judgment to be entered shall incorporate and continue in effect the provisions of the hold separate order entered herein on October 30, 1969, 306 F.Supp. at 799–800, pending receipt by the Clerk of this Court of the mandate of the United States Supreme Court upon any appeal which may be taken from the judgment of this Court pursuant to 15 U.S.C. § 29 (1964).

(8) That the Clerk of this Court is directed to enter final judgment forthwith.

---

The foregoing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.